319 P.3d 338

**In the Interest of T.M.**

**No. SCWC–12–0000521.**

Supreme Court of Hawai'i.

Jan. 6, 2014.

---

Benjamin E. Lowenthal, Wailuku, for petitioner.

Nolan Chock, (with Mary Anne Magnier on the briefs), Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by ACOBA, J.

We hold that the failure of the Family Court of the Third Circuit[1] (the court) to appoint counsel for Petitioner/Mother–Appellant Jane Doe (Petitioner) until nearly nineteen months after Respondent–Appellee Department of Human Services (DHS) filed a Petition for Temporary Foster Custody over Petitioner's son, T.M. constituted an abuse of discretion under Hawai'i Revised Statutes (HRS) § 587–34[2] (2006) and § 587A–17[3] (Supp.2012) which necessitates vacating the court's April 17, 2012 Order "Terminating [Petitioner's] Parental Rights and Awarding Permanent Custody" to DHS.[4] We recognize that parents have a substantive liberty interest in the care, custody, and control of their children that is protected by the due process clause of article I, section 5 of the Hawai'i Constitution.[5] *In re Doe*, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002). Therefore, we additionally hold that parents have a constitutional right to counsel under article I, section 5 in parental termination proceedings and that from and after the filing date of this opinion, courts must appoint counsel for indi-

1. The Honorable Aley K. Auna, Jr. presided.

2. HRS § 587–34 provided in relevant part as follows:
 The court may appoint ... independent counsel for any [ ] party if the party is an indigent, counsel is necessary to protect the party's interests adequately, and the interests are not represented adequately by another party who is represented by counsel.
 (Emphasis added)

3. HRS § 587A–17 provides in relevant part as follows:
 The court may appoint an attorney to represent a legal parent who is indigent based on court-established guidelines. The court may also appoint an attorney to represent another indigent party based on court-established guidelines, if it is deemed to be in the child's best interest. Attorneys who are appointed by the court to represent indigent legal parents and other indigent qualifying parties may be paid by the court, unless the legal parent or party for whom counsel is appointed has an indepen-

gent parents once DHS files a petition to assert foster custody over a child.

For the reasons set forth herein, the aforesaid April 17, 2013 Order of the Court, the "Findings of Fact [ (findings) ] and Conclusions of Law [ (conclusions) ] re [Termination of Parental Rights (TPR) ] Hearing" entered on May 3, 2012, and the July 26, 2013 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its June 28, 2013 Summary Disposition Order affirming the court's order are vacated, and the case is remanded for a new hearing.

I.

A.

T.M. was born to Petitioner on June 8, 2009, when Petitioner was fifteen years old. In August, 2009, Petitioner was "diagnosed with Psychotic Disorder, Bipolar [Disorder], Panic Disorder, and Adjustment Disorder with Mixed Disturbance Emotions/Conduct." DHS filed two Petitions for Temporary Foster Custody, one over Petitioner and one over T.M., on January 6, 2010.

On January 7, 2010, the court held a hearing on the DHS petition. At the hearing, the court advised both Petitioner's parents and Petitioner herself of the salutary purpose of having a court-appointed attorney:

 dent estate sufficient to pay such fees and costs. The court may order the appropriate legal parent or party to pay or reimburse the fees and costs of an attorney appointed for the child or incapacitated adult.
 (Emphasis added.)

4. HRS § 587–34 was replaced by HRS § 587A–17 on September 1, 2010. Thus, HRS § 587–34 applied during the initial hearings in January, 2010, but HRS § 587A–17 applied during the subsequent hearings.

5. Article I, section 5 of the Hawai'i Constitution provides as follows:
 **Section 5**
 No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.
 (Emphasis added.)

[The Court]: You all, the parents, have an opportunity to either agree or disagree with the allegations. If you disagree, that's fine. I mean, you know, I'm not holding anything against anyone until the evidence is presented and I have to make a decision. It's always wise, however, when children are in temporary out-of-home placement, that you have the benefit of having an attorney help you.

And if you cannot afford an attorney, then the Court may appoint an attorney to represent you at no cost to you. All I would need is an application to be completed. I'll review it, and if you qualify financially, I will appoint an attorney to represent you. That's always a good idea only because there's a lot of legal things that happen in the courtroom that you may not be aware of or familiar with, and having an attorney by your side is always a great benefit. You may choose to represent yourself if you wish. That's fine, and I will try my best to help—or let you know what's happening. I cannot give you legal advice, but at least I can kind of give you your options, and you make your decisions on what you want to do. You may, if you wish, hire your own attorney. That's up to you, but that will be at your cost. So there's a couple of options.

(Emphases added.) The court stated it would attempt to find one person to act both as guardian ad litem and as an attorney for Petitioner but suggested that having separate persons act as a guardian ad litem and as an attorney might be necessary:

Now, [Petitioner], her situation is a little different, and that is because she's a minor under the law, she's entitled to a guardian ad litem. At the same time she is a mother, a parent, and so she's entitled to an attorney. I'm going to try my best to find a person that can act in both responsibilities. There may be, though, the situation where she will have both an attorney and a guardian ad litem, two people, because

what the guardian ad litem may feel would be in her best interest may not be what she would like. So that's why she would need an attorney.

(Emphasis added.) The record does not indicate that Petitioner submitted an application for court-appointed counsel at that point.

Following the hearing, the court approved court-appointed counsel for Petitioner's mother and T.M.'s father.[6] However, the court did not appoint counsel for Petitioner. Instead, the court apparently had Stephanie St. John (St. John) act as Petitioner's guardian ad litem. At the next hearing, on January 14, 2010, the court suggested that St. John was serving both as Petitioner's guardian ad litem and Petitioner's attorney:[7]

THE COURT: Okay. Very well. Ms. St. John, you're pretty much playing a dual role here.

MS. ST. JOHN: Well, that's my first thing, your Honor, is that at this point understanding that I haven't spoken with [Petitioner] yet, and I need to speak with her about this stuff because if there's going to be a difference of opinion in working as a guardian ad litem than working as her attorney, then I would be suggesting that she have a separate attorney to deal with her as a mother over [T.M.]. But at this point I haven't spoken with her to find out whether or not there is any conflict between those two positions.

(Emphases added.) But, as indicated above, St. John did not confirm that she was serving as Petitioner's attorney. Instead, St. John told the court that there might be a conflict in serving in both capacities and she would "speak with [Petitioner]" to determine if Petitioner desired to have "a separate attorney".

According to finding 7 of the court's May 3, 2013 findings and conclusions, "[f]amily court jurisdiction over [T.M.] and his parents [including Petitioner] was established at [the] hearing on February 10, 2010. Foster custody was awarded to the [DHS]. For purposes

---

6. No attorney was appointed for Petitioner's father.

7. The "Ohana Conference Report # 1" described St. John as "[Petitioner's guardian at litem] as well as her assigned attorney at this time[.]" An

Ohana Conference is apparently a conference between DHS, the parties, and other resource persons for the family such as therapists or caregivers regarding future proceedings in the case.

of the Child Protective Act, [T.M.'s] date of entry into foster care was <u>February 10, 2010.</u>" (Emphasis in original.)

## B.

A service plan hearing[8] was held on March 3, 2010. The Family Service Plan established the "initial goal" as "[m]aintain[ing] [T.M.] in placement or in a safe family home with his mother, [Petitioner]," and the "reunification of [Petitioner] with her mother, or her father and his fiancé." The "final goal" was to "[m]aintain [Petitioner] and ... [T.M.] in a safe family home without the need for further DHS intervention." The family plan stated that the "target date" to "maintain [Petitioner] and her son, [T.M.] in a safe family home without the need for further DHS intervention" was February 2011.

The Plan provisions required Petitioner to "continue to participate in services provided by [the Department of Health, Family Guidance Center], including compliance with any prescribed medication," and "to make efforts to complete [her] education via attendance at school, work on correspondence courses, and participation in the [ ] Grads Program."[9] The Plan was to "remain in effect until August 23, 2010, or further order of the court." The Plan also set forth "consequences," which explained to Petitioner that "your parental and custodial duties and rights concerning ... [T.M.] ... may be terminated by an award of permanent custody unless you are willing and able to provide ... [T.M.] with a safe family home within the reason-able period of time specified in this family service plan."

However, no provision of the Plan specified the "reasonable period of time" in which Petitioner was required to provide T.M. with a safe family home. The Ohana conference report stated that "if the parents are unable to provide the children with a safe family home within a reasonable period of time up to one year, even with a service plan, parental rights may be subject to termination." However, at the time the service plan was filed, although HRS § 587–72 (2006) did allow DHS to file a motion for a permanent plan hearing if the child was outside the family home for twelve consecutive months, parents could prevail at that hearing by demonstrating that it was "reasonably foreseeable" that they would be able to provide the child with a safe family home in "a reasonable period of time which shall not exceed <u>two</u> years from the date upon which the child was first placed under foster custody by the court." HRS § 587–73 (2006) (emphasis added). This two-year requirement is also reflected in present Hawai'i law. HRS § 587A–33(a)(2) (Supp.2012).

Petitioner was apparently found to have possessed marijuana on November 30, 2010. The terms of her probation included the requirement that she "shall not consume or possess any alcoholic beverages, illegal drugs, non-prescribed prescription drugs, or drug paraphernalia."

A combined second periodic review hearing and permanency hearing[10] was held on Janu-

---

8. The "service plan hearing" was apparently a "disposition hearing" pursuant to HRS § 587–71 (Supp.2006). Under the then-controlling statutory scheme, once the ability of the family court to adjudicate a case was established, the case was required to "be set for a further disposition hearing concerning an appropriate service plan." HRS §§ 587–62(3), (4) (Supp.2006).

At the disposition hearing, the court was required to, *inter alia*, "order [such] terms, conditions, and consequences to constitute a service plan as the court determines to be in the best interests of the child." HRS § 587–71(I). A "service plan" is "a specific written plan prepared by an authorized agency" setting forth, *inter alia*, "[t]he steps that will be necessary to facilitate the return of the child to a safe family home." HRS § 587–26 (Supp.2006).

9. The Grads program is "a special program for teen mothers that enable those mothers to attend high school and look after their babies on campus."

10. HRS § 587A–31 (Supp.2012) provides in relevant part as follows:

(a) <u>A permanency hearing shall be conducted within twelve months of the child's date of entry into foster care</u> or within thirty days of a judicial determination that the child is an abandoned infant or that aggravated circumstances are present. A permanency hearing shall be conducted at least every twelve months thereafter for as long as the child remains in foster care under the placement responsibility of the department or an authorized agency, or every six months thereafter if the child remains in the permanent custody of the department or an authorized agency.

ary 26, 2011. At a permanency hearing, "[t]he court shall review the status of the case to determine whether the child is receiving appropriate services and care, that case plans are being properly implemented, and that activities are directed toward a permanent placement for the child." HRS § 587A–31(b). Under HRS § 587A–31, one of the options at a permanency hearing is for the court to order "the child's continued placement in foster care" if, *inter alia,* "[r]eunification is expected to occur within a time frame that is consistent with the developmental needs of the child." HRS § 587A–31(d).

On January 21, 2011, DHS formulated a revised family service plan. The revised plan added the provision that [Petitioner] "[f]ollow all the requirements of her probation, including additional treatment needs such as substance abuse treatment, etc."

At the January 26, 2011 hearing both DHS and T.M.'s guardian ad litem, Susan M. Kim (Kim), "recommended that [Petitioner] be given more time to reunify with her son." This recommendation was consistent with the

(b) The court shall review the status of the case to determine whether the child is receiving appropriate services and care, that case plans are being properly implemented, and that activities are directed toward a permanent placement for the child.
(c) At each permanency hearing, the court shall make written findings pertaining to:
(1) The extent to which each party has complied with the service plan and progressed in making the home safe;
(2) Whether the current placement of the child continues to be appropriate and in the best interests of the child or if another in-state or out-of-state placement should be considered;
(3) The court's projected timetable for reunification or, if the current placement is not expected to be permanent, placement in an adoptive home, with a legal guardian, or under the permanent custody of the department or an authorized agency;
. . . .
(d) At each permanency hearing, the court shall order:
(1) The child's reunification with a parent or parents;
(2) The child's continued placement in foster care, where:
(A) Reunification is expected to occur within a time frame that is consistent with the developmental needs of the child; and
(B) The safety and health of the child can be adequately safeguarded; or
(3) A permanent plan with a goal of:

goals of the family plan, i.e., to reunify Petitioner with either her mother or father and to reunify T.M. with Petitioner.

At the hearing, St. John noted that she disagreed with Petitioner regarding Petitioner completing a therapeutic home process:

I have to state this because as her guardian ad litem, I have to notify the Court that what I'm going to say is different from what she wants, and I know that she wants to go home to mom.

The problem is that my recommendation would be for her to complete her therapeutic home process.

The court informed Petitioner that she needed to accept more responsibility for the care of T.M. The court also approved the revised "family service plan dated January 21st, 2011," and entered an order finding that "[t]he parents of [T.M.] [including Petitioner] have partially complied with the Family Service Plan. They have only made limited progress toward making their respective homes safe for [T.M.]"

(A) Placing the child for adoption and when the department will file a motion to set the matter for the termination of parental rights;
(B) Placing the child for legal guardianship if the department documents and presents to the court a compelling reason why termination of parental rights and adoption are not in the best interests of the child; or
(C) Awarding permanent custody to the department or an authorized agency, if the department documents and presents to the court a compelling reason why adoption and legal guardianship are not in the best interests of the child.
. . .
(g) If the child has been in foster care under the responsibility of the department for a total of twelve consecutive months or an aggregate of fifteen out of the most recent twenty-two months from the date of entry into foster care, the department shall file a motion to terminate parental rights, unless:
(1) The department has documented in the safe family home factors or other written report submitted to the court a compelling reason why it is not in the best interest of the child to file a motion; or
(2) The department has not provided to the family of the child, consistent with the time period required in the service plan, such services as the department deems necessary for the safe return of the child to the family home.
(Emphases added.)

The court order concluded that "each party present at the hearing understands that unless the family is willing and able to provide the child(ren) [11] with a safe family home, even with the assistance of a service plan, within a reasonable period of time stated in the service plan, their parental and custodial duties and rights shall be subject to termination." (Emphases added.) The service plan did not define "a reasonable period of time[.]"

A combined third periodic review hearing and permanency hearing was held on May 24, 2011. At the hearing, DHS advised that "given the time that's passed so far," it "would like to go ahead and set a [termination of] parental rights [(TPR)] hearing." [12] However, DHS agreed to wait to set

---

**11.** The court order refers to "children" because both Petitioner and T.M. were minors at the time of the hearing.

**12.** HRS § 587A–33 (Supp.2012) provides in relevant part as follows:

> **§ 587A–33 Termination of parental rights hearing.**
> (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
> (1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
> (2) It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;
> (3) The proposed permanent plan is in the best interests of the child. In reaching this determination, the court shall:
> (A) Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and
> (B) Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care; and
> . . .
> (b) If the court determines that the criteria set forth in subsection (a) are established by clear and convincing evidence and the goal of the permanent plan is for the child to be adopted or remain in permanent custody, the court shall order:

the TPR motion until September. The court then stated that it would set a hearing for September 13, 2011. The court explained that "that's not a trial date."

Instead, the court related that "[t]hat's a date to find out where we're going to go. The state's going to file their motion to terminate parental rights. We'll hear that motion at that time." St. John then asserted that an attorney was needed to represent Petitioner with regard to T.M. because Petitioner had "never been assigned . . . an attorney in her case involving [T.M.]":

> MS. ST. JOHN: 8:30 a.m. . . . [B]ecause I am only [Petitioner's guardian ad litem]— and I've mentioned this several times in this case. She has never been assigned anybody as her attorney in her case involv-

---

> (1) That the child's parent's parental rights be terminated;
> (2) Termination of the existing service plan and revocation of the prior award of foster custody;
> (3) That permanent custody of the child be awarded to an appropriate authorized agency;
> (4) An appropriate permanent plan; and
> (5) The entry of any other orders the court deems to be in the best interests of the child, including restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings.
> . . .
> (d) A family member may be permitted visitation with the child at the discretion of the permanent custodian. The court may review the exercise of such discretion and may order that a family member be permitted such visitation as is in the best interests of the child.
> . . .
> (h) If the court determines that the criteria set forth in subsection (a) are not established by clear and convincing evidence, the court shall order:
> (1) The preparation of a plan to achieve permanency for the child;
> (2) The entry of any orders that the court deems to be in the best interests of the child;
> (3) A periodic review hearing to be held within six months after the date of the last permanency hearing; and
> (4) A permanency hearing to be held within twelve months of the date of the last permanency hearing.
> (I) Absent compelling reasons, if the child has been in foster care under the department's responsibility for an aggregate of fifteen out of the most recent twenty-two months from the date of entry into foster care, the department shall file a motion to terminate parental rights.
> (Emphases added.)

ing her child, [T.M.]. If we are going to permanency at this point and [Petitioner] is going to be turning 18, the suggestion is that she apply for and look at getting her own attorney for that case.

THE COURT: Okay. Well, maybe perhaps you can assist her in that, I mean filling out the application. Okay?

MS. ST. JOHN: Sure.

(Emphasis added.)

On May 25, 2011 DHS filed its Motion to Set TPR Hearing, because "[T.M.] has been in foster care ... for an aggregate of fifteen out of the most recent twenty-two months from the date of entry into foster care." On about August 31, 2011, an application for court-appointed counsel was submitted. The application was signed by Petitioner on August 31, 2011, prior to her eighteenth birthday.

### C.

At a combined permanency hearing and termination of parental rights hearing on September 13, 2011, Petitioner still was not represented by counsel. The court noted that it had received Petitioner's application for counsel, but wanted to check with the DHS to see if the case would be resolved by mutual agreement before appointing an attorney. DHS informed the court of a possible agreement with Petitioner whereby T.M.'s current foster mother (foster mother) would become his legal guardian, and Petitioner's parental rights would not be terminated. However, DHS explained that before it could commit to that agreement, it was "required to check out relatives who may be interested in guardianship or adoption." DHS also asserted that it believed "it would be best to have an attorney for [Petitioner]," because "this is a pretty important juncture of the case."

The court then asked St. John if there would be a conflict were she appointed attorney for Petitioner. St. John replied that such an appointment would be a conflict of interest:

MS. ST. JOHN: Your Honor, at this point I believe that it is a conflict. There are a lot of different things that [Petitioner] has

basically not followed through with as a mother to her son, and I don't feel that where my position as to what's in her best interest really coincides with what she needs to be doing as an adult and as a mother and for somebody to advocate for her.

The other thing too is that when we discussed this at the ohana conference, I was very concerned that she wasn't really listening to what the attorneys and the social workers were telling her in the hearing that she needed to hear. I think she really does need to sit down with somebody as an attorney for her ... and get the advice that she needs as a mother dealing with her child, given her and her struggles through her teenage stuff that she's been doing these past couple of years.

(Emphases added.) The court ruled that it "would go ahead and appoint an attorney to represent [Petitioner]." On September 13, 2011, an order was issued appointing Joan Jackson (Jackson) as counsel for Petitioner.

On September 20, 2011, the court again held a combined periodic review hearing and termination of parental rights hearing "for tracking purposes only." Jackson appeared for the first time at the hearing. DHS explained that it was "going to be checking out some relatives to see if they're interested in a long-term caretaker for the child." According to DHS, "if the relatives don't pan out, then we'd be looking at the foster parent as being the guardian for this child, and that would be without terminating parental rights." The court however, wanted to "do the termination of parental rights now" and explained that it "appointed [Jackson] so that she could explain to her client that option."

Jackson, however, related that she had "just met with [Petitioner] this morning," and "didn't discuss with her termination of parental rights because [Jackson] didn't think that [was] the way the case was going." When the court again questioned Jackson regarding Petitioner's willingness to terminate parental rights, Jackson reiterated that she "didn't really discuss it with [Petitioner]," and did not want to "whisper[ ] about it for a moment in court."

The hearing concluded to allow DHS to investigate placement of T.M. with relatives. With regard to the potential guardianship, the court noted that foster mother was the "only ... psychological family" that T.M. knew, and that it might have an impact having the child leave foster mother for a "stranger." DHS stated that "the whole family liked" the option of allowing T.M. to remain with foster mother as a guardian.

On October 4, 2011, DHS reported that there were possible problems with the two relatives they had targeted to potentially adopt T.M. Petitioner's father's sister was not an option because of financial difficulty. Further, T.M.'s paternal aunt and uncle (aunt and uncle) had not returned calls from DHS. The hearing concluded with both Petitioner and DHS stating that they wanted to pursue a guardianship with foster mother.

Following the October 4, 2011 hearing, aunt and uncle apparently stated that they were willing to adopt T.M. At an Ohana Conference, foster mother "decided that she would like to be considered as [an] alternative option, and that the primary option should be [T.M.]'s adoption by [aunt and uncle.]" Because foster mother indicated she would be the second option, DHS made "adoption of [T.M.] by his aunt and uncle the first choice for the Permanent Plan" and no longer pursued placement with foster mother. According to DHS, T.M. would therefore be adopted instead of placed in a guardianship and DHS would seek to terminate Petitioner's parental rights. Petitioner was required to show that she could provide a safe family home for T.M. herself in order for reunification to occur.

On December 13, 2011, a periodic review hearing was held. At the hearing, the court noted that "we're switching now to adoption." Petitioner requested that the TPR hearing be postponed:

[Jackson]: Now the case is about her son. So [Petitioner] really now does not want to lose her child and does not want to have her parental rights terminated. And because she's been an adult herself for just a couple of months, we're asking the Court for a little more time so that [Petitioner] can do what she needs to do to provide a home for herself and her son. She is presently going to substance abuse treatment three times a week and will be going into the women's program, the in-patient BISAC program, when a bed becomes available.

At this point we'd ask the Court not to set a hearing to terminate parental rights but to give mother a little more time to show everyone in this room and the Court that she is able and willing and ready to be a full-time parent for [T.M.] because obviously [T.M.] can't wait for anybody else to get their life together. However, the child is very, very happy with the foster mother. He's actually, according to everyone who spoke at the ohana conference, a very well-adjusted, happy child, who knows who all of his relatives are and feels loved by all these people. But I think it would be very difficult and sad for [T.M.] to suddenly be moved to a different home and lose contact with his mother. So I'm asking the Court for a little more time so that Petitioner can do what she needs to do to provide a home for herself and her son.

(Emphases added.) The court recounted that "we have a deadline to meet according to the statute, two years from the date of entry into foster care." According to the court, "what that means for the parents is that unless you can have the child back in your home within that two-year mark ... the child goes elsewhere permanently."[13] The court stated that, therefore, "February 10, 2012 [was a] deadline here that we need to make or meet." A review hearing, which would also serve as a pretrial conference, was scheduled for February 7, 2012 and the TPR hearing for March 2, 2012.

At the pretrial hearing on February 7, 2012, Petitioner moved for a six-month continuance of the TPR hearing because Petitioner had done "a tremendous turnaround":

[Jackson]: You know, on behalf of [Petitioner], who just turned 18 in September, I

---

13. The court observed that "I suppose someone could make an argument that, you know, [Petitioner] was a minor all this time and she didn't become an adult until recently, and therefore somehow the time is tolled." However, this argument was not pursued by either party.

would like to say or reiterate a couple of things and ask the Court to consider her age and <u>to consider the fact that recently, certainly since the last hearing, she's done a tremendous turn-around.</u>

. . .

[Petitioner] feels that she's going to lose contact with [T.M.], that he's going to be in Ocean View, raised by people who probably can provide him a good home, but she's afraid of losing him and of losing contact with him. And as I say, she's very, very young. <u>She apparently has gotten the message that this child, you know, is her child and that if she wants to be his mother and raise him, she has to do a number of things to be able to provide a home for him, including employment, earning a living, having a home, an actual residence where she can live with him and raise him, an ability to pay the rent and to provide for him in every other way.</u>

And at this point although we have the hearing scheduled in just a few weeks, <u>I'm asking the Court to consider delaying that hearing and continuing it for another six months.</u>

(Emphases added.) Petitioner further stated that she wanted to "continue on her path to be independent and to be able to provide a home for her son because that is really what she wants to do." Hence, Petitioner's position at the February 7, 2012 hearing apparently was that she wanted to obtain custody of T.M. in six months.

DHS, however, asked the court to "proceed as scheduled." DHS said that "apparently mother has done really well in the past few weeks," but also felt "it's important that . . . pressure continue to be put [sic] in terms of trying to get something done because up to this point . . . [Petitioner's] record was really pretty bad in terms of drug use and not doing services and not visiting." Similarly, Kim related that Petitioner had "only been clean for maybe about a month," and "as of December, she was still testing dirty[.]" The court denied Petitioner's motion for a continuance.

## II.

### A.

The TPR hearing began on March 2, 2012. At the hearing, Petitioner took the position that the court should "delay its ruling on the question of termination . . . for six months" because Petitioner "has been making progress by leaps and bounds[.]" Petitioner's case manager, Susan McCree (McCree), testified that Petitioner's drug tests were "negative on [December 30, 2011, and January 3, 6, 10, 20, and 24, 2011.]" However, "she tested positive for marijuana on [December 16 and 21, 2011]" McCree was also "informed . . . that [Petitioner] also tested positive about 30 days ago."

McCree related that she would support waiting six more months if Petitioner's substance abuse counselor believed that she would be able to maintain sobriety. After consulting with Petitioner's substance abuse counselor, McCree discovered that Petitioner also had relapsed on alcohol "[t]his past Friday[.]" McCree expressed concern because "if [Petitioner[ ] had really hit the point of maturity and honesty that I certainly had thought she had," she would have disclosed to DHS that she had relapsed with alcohol. McCree recommended that the court pursue the permanent adoption of T.M.

According to foster mother, Petitioner had lived in her home along with T.M. from January 7, 2010 until approximately August 15, 2010. After Petitioner left her home, she visited T.M. "once a week." Foster mother testified that her concern with Petitioner being a full-time mother was her "consistency[.]" Foster mother explained that she didn't "think that at this point [Petitioner's] anywhere close to being . . . to be a mom 24–7."

Foster mother related that although she was willing to give Petitioner more time in September, she "began to see that the changes that I had hoped would occur with [Petitioner] as far as finding a job . . . and being able to take care of herself were not taking place, were not happening. When she was telling me that she was clean and sober, she in fact was not clean and sober. So there were lies going on."

On the other hand, Holly Lindstrom (Lindstrom), Petitioner's primary care counselor for substance abuse, testified that she had "seen a change in [Petitioner] over time[.]" Lindstrom related that Petitioner was "very motivated to achieve sobriety[.]" She explained that "relapse is just part of the process of people battling their addiction," and that Petitioner "admitted to me that she felt like she had turned a corner based on recognizing that she really is an addict and that she needs to really embrace recovery." Lindstrom felt that Petitioner was now "taking this more seriously," and was "willing to try and help herself recover."

However, Lindstrom also testified that Petitioner was "in the early phases of recovery." Petitioner's recovery program consisted of five stages, "pre-contemplative, contemplative, preparation, action, and maintenance[.]" Petitioner was presently in the "contemplative" stage.

Petitioner's probation officer, Wendy Mitchell (Mitchell) also testified that Petitioner had made significant progress recently. Mitchell related that in "the past three, four months, I see a very big turn-around, like 180–degree turn-around of her for the most part. That's mostly consistent, you know, occasional little slips from that, but way more honest, way more willing to admit to her slips, her relapses, the mistakes she's making, and just being a lot more forthcoming in acknowledging her weaknesses and her areas of her problems."

Mitchell also noted that Petitioner had voluntarily admitted her recent use of alcohol both to herself and Lindstrom. Mitchell explained that this made her feel "really positive, really good," because Petitioner was "being honest with [Mitchell], and "this was something she could have gotten away with." Mitchell believed that Petitioner was "committed to working towards sobriety at this time[,] and that "her son is her number-one priority most of the time[.]" Following questions from the Court, Mitchell stated that Petitioner admitted that she had received alcohol "from a young man she was cruising with[.]"

Petitioner testified that she did not feel she could currently take care of T.M. However, she believed that she would be able to care for him "within the next four to six months[.]" Petitioner had recently obtained a job where she would earn "possibly $588 to $600 a month," and that she would use this money to pay her rent on a studio apartment. She was planning to complete her education at Hawai'i Community College. According to Petitioner, she had been spending all day at foster mother's home with T.M. every Saturday and Sunday for "six to eight weeks now." Petitioner explained that she would wake up at between four o'clock or "five o'clock in the morning" and either hitchhike or take the bus in order to spend the entire day with T.M.

Petitioner further stated that she was "committed" to her substance abuse recovery program. She felt that she had a "very good" relationship with Lindstrom.

In closing argument, Kim, T.M.'s guardian ad litem, also requested that Petitioner's parental rights be terminated. She stated that "it's indisputable" that "[Petitioner] has really tried to step up to the plate since the last hearing in December," but that "[u]nfortunately, she is still quite new in her recovery." Kim maintained that "a child does not wait for his or her parents," and "[T.M.'s] been growing for over two years now in the system, and he does deserve a permanent home[.]"

### B.

The court orally issued its decision terminating Petitioner's parental rights on March 16, 2012. On May 3, 2012, the court issued its written findings and conclusions regarding the TPR hearing. In relevant part, the court found that Petitioner "has made positive progress and matured over the last couple months," but that "the evidence also indicates that [Petitioner] lacks adequate resources and ability to care for both herself and her son." The court was "not confident that [Petitioner] will be able to make lasting positive changes at any point in the near future."

The court therefore concluded that Petitioner was "not presently willing and able to provide [T.M.] with a safe family home, even

with the assistance of a service plan" and that it was "not reasonably foreseeable that [Petitioner] ... will become willing and able to provide [T.M.] with a safe family home, even with the assistance of a service plan, within a reasonable period of time to not exceed two years from [T.M.'s] date of entry into foster case, which was on February 10, 2010." Hence, the court ruled that "[t]he Permanent Plan filed with the court on December 6, 201[1] is in the best interest of the child." Under the permanent plan, Petitioner's parental rights would be terminated and T.M. would be adopted by his aunt and uncle.

### III.

Petitioner appealed to the ICA. The ICA affirmed the court's decision to terminate Petitioner's parental rights. The ICA majority opinion held that the court did not abuse its discretion "when it failed to appoint counsel to represent [Petitioner] earlier in the proceedings." *In re T.M.*, No. CAAP–12–000521, 129 Hawai'i 453, 2013 WL 3364109, at *1 (Haw.App.2013) (SDO). The majority noted that Petitioner "challenges none of the [court's] findings of fact but instead[ ] argues in a vague and conclusory manner that she could have avoided termination proceedings if counsel had been appointed sooner." *Id.* However, "an independent view of the record reveal[ed] no indication that the lack of earlier-appointed counsel prejudiced [Petitioner's] substantial rights." *Id.* (citing *In re Doe*, 99 Hawai'i at 534 n. 18, 57 P.3d at 459 n. 18).

In this regard, the ICA majority explained that Petitioner did not file an application for court-appointed counsel until September 2011, that the proceedings were not initially adversarial in nature, and that Petitioner "was counseled by the [court] itself on what was expected of her if she wanted to retain her child." *Id.* at *1–2. The majority concluded that it "[could not] hold that the court's omission '[led] to [an] erroneous decision[.]'" *Id.* at *1 (quoting *Lassiter v. Dep't*

of Soc. Servs. of Durham Cnty., N.C., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).[14] The ICA majority therefore affirmed the court's order.

Chief Judge Nakamura dissented. He noted that "both the Family Court and the guardian ad litem recognized that Mother's rights and interests as a parent were distinct from and may conflict with Mother's rights and interests as a child. Nevertheless, the Family Court waited until nineteen months after T.M. was placed in foster custody before appointing counsel for Mother." *Id.* at *4 (Nakamura, C.J., dissenting). He would have held that "the Family Court did not appoint counsel early enough before the parental termination hearing to give Mother a fair opportunity to defend against the DHS's request to terminate her parental rights." *Id.* (citing *In re "A" Children*, 119 Hawai'i 28, 57–59, 193 P.3d 1228, 1257–59 (App. 2008)). Hence, Chief Judge Nakamura would have "vacate[d] the order terminating Mother's parental rights and remanded the case for further proceedings." *Id.*

### IV.

In her Application Petitioner asks in pertinent part whether "counsel for an indigent minor parent[,]" such as Petitioner, should have been appointed "to defend her parental rights and advise her while her child remained in foster care for more than nineteen months[.]"

### V.

■ We hold that the court's failure to appoint counsel for Petitioner prior to September 13, 2012 constituted an abuse of discretion under HRS § 587–34 and § 587A–17. Because those statutes[15] stated that the court *may* appoint an attorney to represent a legal parent who is indigent, HRS § 587A–17; *see also* HRS § 587–34, "discretion resided in the court as to whether to do so[.]" *In*

---

**14.** The ICA majority held that the court did not abuse its discretion in refusing to continue the TPR hearing. According to the majority "[Petitioner] was given a reasonable amount of time, more than two years, after T.M. was placed in foster custody, to demonstrate that she was will-

ing and able to provide T.M. with a safe family home." In light of our disposition we do not reach the continuance issue.

**15.** HRS § 587A–17 was not raised by either party.

*re Doe*, 108 Hawai'i at 153, 118 P.3d at 63 (holding that a statute that provided that the court "may" appoint a guardian ad litem left the court with discretion to make an appointment). "In reviewing a court's exercise of discretion it must be determined whether the court abused its discretion." *In re Doe*, 108 Hawai'i at 153, 118 P.3d at 63. "An abuse of discretion occurs when the trial court exceeds the bounds of reason or disregards rules of principles of law or practice to the substantial detriment of a party[.]" *Id.* (internal quotation marks omitted).[16]

## A.

The record demonstrates that the court was aware from the inception of the proceedings that Petitioner required an attorney in her role as mother, yet failed to appoint one until September 13, 2011. The nineteen month delay in the appointment of counsel for Petitioner constituted an abuse of discretion.

As noted, on January 6, 2010, DHS filed a petition to assert temporary custody over both Petitioner and T.M. A hearing on the Petition was held on January 7, 2010, and the court informed all of the parties that they could file an application for a court-appointed attorney. As to Petitioner, the court explained that she was entitled to a guardian ad litem as a child, and to an attorney as a mother. The court stated that it would try to appoint an individual to "act in both responsibilities," but acknowledged that there might be a conflict if the same person was appointed to serve both roles.

After the initial hearing, the court immediately granted the applications for a court-appointed attorney for T.M.'s father and Petitioner's mother. However, the court did not appoint an attorney for Petitioner, even though it recognized the potential conflict of having one person serving both as guardian ad litem and as attorney. Instead, St. John was appointed as Petitioner's guardian ad litem. At the January 14, 2010 hearing the court told St. John that she was "playing a dual role here." However, St. John, rejected the assertion that she was also serving as Petitioner's attorney. The record does not indicate that the court followed through with St. John to determine whether a conflict existed between her "dual role[s]." [17]

Despite the court's recognition at the January 7, 2010 hearing that it was "a good idea" for the parties to be represented by counsel, and that unrepresented parties would have difficulty understanding the legal significance of the proceedings, the court failed to appoint Petitioner an attorney. Thus, Petitioner was the only primary party [18] without counsel.[19]

---

16. In its Response to the Application, DHS maintains that the court did not err. According to DHS, Petitioner "speculates that [she] would not have lost her parental rights if an attorney appointed earlier had: explained the deadlines of the Child Protective Act to [her], developed a strategy to comply with the service plan, and/or sought out relatives to take custody of T.M. instead of the child remaining in DHS foster custody." DHS argues, however, that once an attorney was appointed for Petitioner, her attorney did not raise any of these issues. Thus, DHS maintains that "Petitioner and her attorney determin[ed] that they were satisfactorily addressed or that they were not significant enough to raise (thus waiving any objections)."

DHS also asserts that "[a]lthough [Petitioner] was not represented by legal counsel during a major portion of this case, she did have an attorney when it mattered most, the five-and-a-half months prior to the TPR hearing." According to DHS, "[w]hile it is true that [Petitioner] was not provided with a court-appointed attorney until after she [became] an adult, it is also true that [Petitioner] did not submit her application for a court-appointed attorney until a week before her 18th birthday."

17. The failure to appoint counsel was not remedied by the appointment of St. John as Petitioner's guardian ad litem. Due to the possibility of a conflict of interest between a guardian ad litem's role as the advocate of the best interests of the child and a lawyer's role as the zealous advocate of the client's position, it has been explained that "it is important that [a] guardian ad litem ... not undertake to represent [the child] as a parent." Sarah Katz, *When the Child is a Parent: Effective Advocacy for Teen Parents in the Child Welfare System*, 79 Temp. L. Rev. 535, 552 (Summer 2006).

18. As stated before, the court also did not appoint counsel for T.M.'s father.

19. To reiterate, DHS agreed that the court waited nineteen months to appoint an attorney for Petitioner, while she was a minor.

At the May 24, 2011 hearing, St. John brought Petitioner's absence of counsel to the court's attention. St. John stated that she was only serving as Petitioner's guardian ad litem, and reminded the court that Petitioner had never been assigned an attorney. At the same hearing, DHS informed the court that it was going to file a motion to terminate Petitioner's parental rights. St. John then suggested to the court that because the DHS sought to terminate Petitioner's parental rights, counsel should be appointed for Petitioner. However, the court took no action even though it had the discretion to appoint counsel for Petitioner. Instead, the court left it to the guardian ad litem who had taken opposing positions to that of Petitioner to do so.

On September 13, 2011, the court noted that it had received Petitioner's application for counsel but that it had "not appointed anyone yet" because of the "possibility that this matter is going to be resolved by way of [an agreement between the parties regarding] a guardianship." Thus, despite the existence of ongoing negotiations among the parties, Petitioner was left unrepresented. The court's decision to delay the appointment of counsel until after the outcome of the settlement proceedings left Petitioner without a legal advocate for her position in the crucial negotiations among Petitioner, T.M.'s guardian, and DHS.

On September 20, 2011, only five months before the termination hearing, Jackson appeared for the first time. The court at several points asked Jackson if Petitioner was willing to agree to terminate her parental rights, even though Petitioner's counsel had "just met with Petitioner [that] morning." Jackson disclosed that she "didn't think that

[the termination of parental rights was] the way the case was going." Thus, it is apparent that at the September 20, 2011 hearing DHS abandoned its original approach of guardianship without parental rights termination, and the court shifted to asking Petitioner to accede to the termination of her parental rights. Consequently, it was crucial that Petitioner was provided counsel at the inception of the proceedings to inform her of the limitations of the guardianship approach and of the possibility that if other options were pursued, her parental rights would be in jeopardy.

 Additionally, nothing in the record demonstrates that Petitioner was aware that she had a two-year deadline to provide T.M. with a safe family home under the Child Protective Act.[20] The report from the first Ohana Conference incompletely stated that Petitioner had one year to provide a safe family home for T.M. Thus, Petitioner was without counsel to advise her of significant deadlines.

Finally, the events following the appointment of counsel indicate the necessity of appointing counsel for Petitioner at the time T.M. was taken into DHS custody. At the September 13, 2011 hearing, St. John noted that Petitioner "wasn't really listening to what the attorneys and the social workers were telling her in the hearing that she needed to hear." Therefore, St. John believed that Petitioner "really [did] need to sit down with somebody as an attorney for her ... [to] get the advice that she needs as a mother dealing with her child." (Emphases added.) St. John's statement makes it clear that, prior to September 13, 2011, Petitioner

---

**20.** Although Petitioner seemingly maintains otherwise, the Family Service Plan filed on March 3, 2010 did not violate HRS § 587A–27(a)(7) for not informing Petitioner that "the parents' failure to provide a safe family home within two years from the date when the child was first placed under foster custody by the court, may result in the parents' parental rights being terminated[.]" HRS § 587A–27(a)(7) did not take effect until September 1, 2010, after March 3, 2010. *See* 2010 Haw. Sess. Laws Act 135. Although the two-year deadline existed under the prior statute, *see* HRS § 587–73, the requirement in HRS § 587A–27(a)(7) that the family service plan

"shall provide ... notice to the parents" of the two-year deadline was not contained in prior Hawai'i law. *See* HRS § 587–26. Also, the prior statute required that a family plan "set forth ... the time frames during which ... such actions must be completed." HRS § 587–26(c)(2). In violation of HRS § 587–26(c)(2), the family plan in this case did not contain the requisite specific time frames.

The revised service plan dated January 21, 2011 was subject to HRS § 587A–27(a)(7). That revised service plan also did not inform Petitioner of the two-year deadline, in violation of HRS § 587A–27(a)(7).

was not afforded legal advice on how to maintain her parental rights to T.M.

However, following the court's appointment of an attorney, Petitioner's behavior improved significantly. Petitioner began to pass her drug tests and become more involved in her substance abuse counseling. This was reflected in the court's findings after the termination hearing. The court stated that Petitioner had "made positive progress and matured over the last couple of months." Petitioner made rapid strides following the appointment of counsel.

Additionally, Petitioner had made progress in being able to provide a safe family home for T.M. Petitioner had lived with T.M. for eight months in foster mother's home, and visited once a week after August 15, 2010. Before trial, Petitioner would wake up before 5 a.m. to travel to foster mother's home to spend both Saturday and Sunday with T.M. Therefore, Petitioner had probably developed a connection with T.M. It may be that had counsel been appointed sooner, Petitioner may have been able to comply with the terms of the family plan and provided T.M. with a safe family home at an earlier date.

### B.

In sum, the court did not appoint counsel for Petitioner until more than nineteen months after T.M. entered foster custody, and only five months prior to the hearing that ultimately terminated Petitioner's parental rights. The failure to immediately appoint counsel for Petitioner even after it became apparent that DHS would seek to terminate Petitioner's parental rights left Petitioner without the necessary assistance to prepare for the March 2, 2012 termination hearing. Petitioner was without legal guidance and did not have an advocate to represent her in negotiations with DHS.

Because for most of the proceedings, Petitioner was the only primary party without counsel, it was unreasonable not to have afforded Petitioner the assistance of counsel while the other primary parties, including DHS, were represented by counsel. Consequently, the court abused its discretion in failing to appoint counsel earlier in the proceedings. Thus, the court's April 17, 2012 Order Terminating Parental Rights and Awarding Permanent Custody to DHS must be vacated, and the case remanded for a new hearing.

### VI.

The foregoing review of the instant case reveals the inadequacy of an approach that allows the appointment of counsel to be determined on a case-by-case basis once DHS moves to assert foster custody over a child.[21] In *Doe*, this court "affirmed, independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article I, section 5 of the Hawai'i Constitution." 99 Hawai'i at 533, 57 P.3d at 459. *Doe* explained that "parental rights guaranteed under the Hawai'i constitution would mean little if parents were deprived the custody of their children

---

21. On October 11, 2013, Amici Curiae Legal Aid Society of Hawai'i, Hawai'i Appleseed Center for Law and Economic Justice, and American Civil Liberties Union of Hawai'i Foundation (Amici) filed a brief in support of Petitioner. Amici argued that "[t]he case-by-case approach to appointing counsel imposes an impossible burden on trial judges," because such an approach "compel[s] a trial court to 'determine in advance what difference legal representation might make'" and "a case's complexity might change as the case develops." (Quoting *Lassiter*, 452 U.S. at 51 n. 19, 101 S.Ct. 2153 (Blackmun, J., dissenting).) (Emphasis in original.)

Additionally, Amici maintained that the failure to appoint counsel prior to trial can "preclude a meaningful review of a denial of counsel by the appellate court," because "'a parent acting pro se is … likely to be unaware of controlling legal standards and practices, and unskilled in garnering relevant facts.'" (Quoting *Lassiter*, 452 U.S. at 51 n. 19, 101 S.Ct. 2153 (Blackmun, J., dissenting).) Therefore, a parent acting pro se is unlikely to develop a record sufficient to allow meaningful appellate review.

Finally, as to the court's statement that it was considering St. John as both Petitioner's attorney and guardian ad litem, Amici assert that "such attempt at dual-capacity representation would have been ineffective" due to obvious conflicts of interest. For example, "'the guardian ad litem may have intimate knowledge of the teenager's mistakes or foibles which could be used against her in determining whether her child is to be adjudicated dependent.'" (Quoting Katz, *When the Child is a Parent* 79 Temp. L. Rev. at 552.)

without a fair hearing." *Id.* "Indeed, '[p]arents have a fundamental liberty interest in the care, custody, and management of their children and the state may not deprive a person of his or her liberty interest without providing a fair procedure for the deprivation.'" *Id.* (quoting *Hollingsworth v. Hill*, 110 F.3d 733, 738–39 (10th Cir.1997)). *Doe* therefore held that the right to a "fair procedure" required the appointment of interpreters "at family court proceedings where [ ] parental rights are substantially affected." 99 Hawai'i at 534, 57 P.3d at 460.

In *In re "A" Children*, the ICA held that the court's failure to timely appoint counsel resulted in the father not receiving notice of hearings. 119 Hawai'i at 58, 193 P.3d at 1258. Judge Watanabe, writing for the ICA, pointed out that this created "a chain of events" that led to the termination of his parental rights and "that could have been broken if Father had had counsel." *Id.* The ICA applied the case-by-case approach adopted by a majority of the Supreme Court in *Lassiter*, where that court balanced the parent's interests, the state's interests, and the risk that a parent will be erroneously deprived of his or her child. *Id.* at 57, 193 P.3d at 1257. The ICA concluded that the dispositive factor was the third factor, and ruled that the "belated appointment of an attorney created an appreciable risk [the father] would be erroneously deprived of his parental rights[.]" *Id.* at 58, 193 P.3d at 1258.

However, the ICA "express[ed] grave concerns ... about the case-by-case approach adopted in *Lassiter* for determining the right to counsel." *Id.* at 60, 193 P.3d at 1260. According to the ICA, "as Justice Blackmun observed," under the case-by-case approach, "[a] trial judge will be required to determine in advance what difference legal representation might make." *Id.* (quoting *Lassiter*, 452 U.S. at 51 n. 19, 101 S.Ct. 2153) (Blackmun,

J., dissenting). The ICA then concluded that "the *Lassiter* dissents present compelling arguments for a bright-line rule regarding the provision of counsel in termination-of-parental rights cases[.]" *Id.*

In *RGB*, an indigent parent asserted that her court-appointed counsel was ineffective. 123 Hawai'i at 17, 229 P.3d at 1082. Because the family court-appointed counsel, the *RGB* majority "decline[d] to reach the question of whether the Hawai'i Constitution provides indigent parents a right to counsel in all termination proceedings." *Id.* at 18, 229 P.3d at 1083.[22]

### B.

Inherent in the substantive liberty interest that parents have in the care, custody, and control of their children under the Hawai'i Constitution is the right to counsel to prevent erroneous deprivation of their parental interests. As Justice Stevens asserted in *Lassiter*, the State's decision to deprive a parent of his or her child is often "more grievous" than the State's decision to incarcerate a criminal defendant. *Lassiter*, 452 U.S. at 59, 101 S.Ct. 2153 (Stevens, J., dissenting). Hence, "the reasons supporting the conclusion that the Due Process Clause ... entitles the defendant in a criminal case to representation by counsel apply with equal force" in cases where the state seeks to terminate parental rights. *Id.* (emphasis added).

This court has held that "[t]he right to counsel is an essential component of a fair trial" in the criminal context. *State v. Tarumoto*, 62 Haw. 298, 299, 614 P.2d 397, 398 (1980). The same considerations suggest that an attorney is necessary for a "fair procedure" in parental termination proceedings. *See Doe*, 99 Hawai'i at 534, 57 P.3d at 460; *see also RGB*, 123 Hawai'i at 47, 229 P.3d at 1112 (Acoba, J., dissenting) (stating that an attorney should be provided in termi-

---

**22.** The dissenting opinion explained that counsel was ineffective for "failing to file a timely motion for reconsideration of the court's Termination Order," and the late appointment by the family court of counsel left Petitioner's counsel with only "two days in which to file a timely motion for reconsideration." *RGB*, 123 Hawai'i at 62, 229 P.3d at 1127 (Acoba, J., dissenting). The

dissent concluded that as "the right to effective assistance of counsel is protected under the Hawai'i Constitution ... the majority's opinion implicate[d] [the parent's] due process right to effective counsel under the Hawai'i Constitution." *Id.* at 50, 229 P.3d at 1115 (internal emphasis removed).

nation hearings in light of the "constitutionally protected liberty interest at stake").

Furthermore, as Justice Blackmun explained in *Lassiter,* a parent in termination proceedings may struggle with legal issues that are "neither simple nor easily defined," and with a standard that is "imprecise and open to the subjective values of the judge." 452 U.S. at 45, 101 S.Ct. 2153 (Blackmun, J., dissenting). A parent must "be prepared to adduce evidence about his or her personal abilities and lack of fault, as well as proof of progress and foresight as a parent[.]" *Id.* at 46, 101 S.Ct. 2153. They are faced "with an adversary—the State—that commands great investigative and prosecutorial resources, with standards that involve ill-defined notions of fault and adequate parenting, and with the inevitable tendency of a court to apply subjective values or to defer to the State's 'expertise.' " *Id.*

In *Matter of K.L.J.,* 813 P.2d 276 (Alaska 1991), the Alaska Supreme Court held that counsel is necessary in termination proceedings because " 'the crucial determination about what will be best for the child can be an exceedingly difficult one[,] . . . it requires a delicate process of balancing many complex and competing considerations that are unique to every case.' " *Id.* at 282 (quoting *Flores v. Flores,* 598 P.2d 893, 896 (Alaska 1979)). Thus, "a parent cannot possibly succeed" without "the guiding hand of counsel." *Lassiter,* 452 U.S. at 46, 101 S.Ct. 2153 (Blackmun, J., dissenting). Hence, the appointment of an attorney is crucial to ensure that parents are provided a "fair procedure." *See Doe,* 99 Hawai'i at 533, 57 P.3d at 458.

*Doe* held that an interpreter was necessary where "parental rights are substantially affected." 99 Hawai'i at 534, 57 P.3d at 459. In the context of the Child Protective Act,

the filing of a petition to assert custody initiates the termination process. As stated before, once a child is "is in foster care under the department's responsibility" for an aggregate of fifteen of twenty two months, DHS must file "a motion to terminate parental rights." HRS § 587A–33(I). At a termination hearing, parents must establish that they can provide a safe family home within two years of the child's entry into foster care. HRS § 587A–33(a)(2). However, before the termination hearing itself, issues that may be decisive in that proceeding may have been determined subsequent to DHS attaining custody of the child. Thus, as soon as DHS files a petition asserting custody over a child, parents' rights are "substantially affected." At that point, an attorney is essential to protect an indigent parent's liberty interest in the care, custody and control of his or her children.[23]

## VII.

Mandating the appointment of counsel for indigent parents once DHS moves for custody would remove the vagaries of a case-by-case approach. As mentioned before, under the case-by-case approach, " 'it will not always be possible for the trial court to predict accurately, in advance of the proceedings, what facts will be disputed, the character of cross-examination, or the testimony of various witnesses.' " *Matter of K.L.J.,* 813 P.2d at 282 n. 6 (quoting Kevin W. Shaughnessy, Note, *Lassiter v. Department of Social Services: A New Interest Balancing Test for Indigent Civil Litigants,* 32 Cath. U.L. Rev. 261, 282–83 (1982)) (hereinafter Note, *A New Interest Balancing Test); accord RGB,* 123 Hawai'i at 49, 229 P.3d at 1114 (quoting *K.L.J.*). Hence, in a case-by-case approach,

---

**23.** In contrast to the federal rule, *see Scott v. Illinois,* 440 U.S. 367, 373–74, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979), indigent criminal defendants in Hawai'i have a right to an attorney whenever they are threatened by imprisonment, even if imprisonment is not subsequently imposed. *State v. Dowler,* 80 Hawai'i 246, 249, 909 P.2d 574, 577 (App.1995). The ICA pointed out in *Dowler* that, because the "Hawai'i Constitution requires that '[t]he State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment,' " "an indi-

gent criminal defendant's right to appointed counsel is determined not by whether imprisonment is actually imposed." *Id.*

Thus, in Hawai'i, the appointment of counsel is mandated because attempting to determine in advance of the proceedings whether legal representation would ultimately be required is an exercise in futility. The safeguard for parental rights thus rests on the appointment of counsel at the beginning of proceedings, in the instant case in February, 2010, when T.M. was taken into custody by DHS.

there is a " 'possibility that appointment of counsel will be denied erroneously by the trial court.' " *Matter of K.L.J.*, 813 P.2d at 282 n. 6 (quoting Shaughnessy, Note, *A New Interest Balancing Test,* at 282–83).[24]

Similarly, " 'the case-by-case approach ... does not lend itself practically to judicial review.' " *Id.* (quoting Shaughnessy, Note, *A New Interest Balancing Test,* at 282–83). " '[T]he reviewing court must expand its analysis into a cumbersome and costly, time-consuming investigation of the entire proceeding.' " *Id.* (quoting Note, *A New Interest Balancing Test,* at 282–83). Moreover, the harm suffered by parents proceeding without counsel may not be readily apparent from the record, especially because without the aid of counsel, it is unlikely that a case is "adequately presented." *Lassiter,* 452 U.S. at 51, 101 S.Ct. 2153 (Blackmun, J., dissenting).

Additionally, real human costs are sustained by all of the parties when, as in the instant case, the court's failure to appoint counsel results in a remand for further proceedings. Under such circumstances, the court's ultimate determination regarding a child's placement may be significantly delayed. Both parents and children face continued uncertainty regarding parental status and a child's future. These costs would be mitigated by a rule cognizant of the reality that counsel is essential to ensuring that parents are provided a "fair procedure." *See Doe,* 99 Hawai'i at 533, 57 P.3d at 459.

▪ In sum, difficulties stemming from the case-by-case approach can result in the erroneous termination of parental rights.[25] Thus, in light of the constitutionally protected liberty interest at stake in a termination of parental rights proceeding, we hold that indigent parents are guaranteed the right to court-appointed counsel in termination proceedings[26] under the due process clause in article I, section 5 of the Hawai'i Constitution. We direct that upon the filing date of this opinion, trial courts must appoint counsel for indigent parents upon the granting of a petition to DHS for temporary foster custody of their children.[27]

### VIII.

Based on the foregoing, the court's April 17, 2012 order terminating parental rights, the May 3, 2012 findings and conclusions "re TPR Hearing", and the July 26, 2013 judgment of the ICA filed pursuant to its June 28, 2013 Summary Disposition Order affirming the court's order are vacated, and the case is remanded to the court for a new hearing consistent with this opinion.

24. Under *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) courts must consider the parent's interests, the state's interests, and "the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel." *Lassiter,* 452 U.S. at 27–28, 101 S.Ct. 2153. However, "weighing the *[Mathews]* factors on a case-by-case basis will <u>always</u> come out in favor of appointing counsel under the Hawai'i Constitution." *RGB,* 123 Hawai'i at 47, 229 P.3d at 1112 (Acoba, J., dissenting) (emphasis in original).

As to the first factor, " 'a parent's desire for and right to the custody of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection[.]' " *RGB,* 123 Hawai'i at 47, 229 P.3d at 1112 (Acoba, J., dissenting) (quoting *Lassiter,* 452 U.S. at 27, 101 S.Ct. 2153) (internal punctuation removed). As to the second factor, the State's interests weigh "largely <u>in</u> <u>favor</u> of appointing counsel," inasmuch as " 'the State has an urgent interest in the welfare of the child[.]' " *Id.* (quoting *Lassiter,* 452 U.S. at 27, 101 S.Ct. 2153) (emphasis in original). Finally,

as to the third factor, "the risk of erroneous deprivation is undeniably present in every case." *Id.* Therefore, even if the Mathews test is applied, counsel should always be appointed under the Hawai'i Constitution.

25. At oral argument, all the parties agreed with mandating the appointment of counsel in the future. Petitioner explained that there was "no downside" to a rule requiring the appointment of counsel. Similarly, the DHS concurred that a prospective rule would "serve the interests of justice."

26. Our decision does not render HRS § 587A–17, which allows courts the discretion to appoint counsel on a case-by-case basis, unconstitutional. Rather, our decision augments HRS § 587A–17 in recognition of the due process protection in the Hawai'i Constitution afforded to parents. *Doe,* 99 Hawai'i at 533, 57 P.3d at 459.

27. We do not address the circumstances under which the right to counsel could be waived.