**FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000748
27-JUL-2021
08:05 AM
Dkt. 95 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

IN THE INTEREST OF J.M. and Z.M., Minors

NO. CAAP-20-0000748

APPEAL FROM THE FAMILY COURT OF THE FIFTH CIRCUIT
(FC-S NO. 19-00007)

JULY 27, 2021

GINOZA, CHIEF JUDGE, LEONARD AND HIRAOKA, JJ.

OPINION OF THE COURT BY LEONARD, J.

In many ways, this termination of parental rights case follows an unfortunate, but familiar, pattern. Parents are both on drugs and are unable to provide their children with a safe family home. The State gets involved, but parents do not comply with mandatory drug testing, continue to test positive for drugs, otherwise fail to complete or delay getting through a substance

abuse treatment program and other services, and skip court hearings.  The parents' parental rights are then terminated and permanent custody of their children is awarded to the State.

No matter what circumstances bring parents before a court, however, indigent parents are guaranteed the right to court-appointed attorneys in termination proceedings under the due process clause of the Hawaiʿi Constitution, as well as the Fourteenth Amendment of the United States Constitution.  Here, we hold that such an attorney is essential throughout proceedings that could result in the termination of parental rights.  As the Hawaiʿi Supreme Court recently held, representation is so essential that failure to provide counsel to indigent parents facing possible termination of their parental rights is structural error that cannot be deemed harmless error.  We further hold that, in this case, the discharge of the father's attorney during the pendency of these proceedings, prior to the family court's decision on a motion to terminate his parental rights, violated the father's due process rights and was structural error.  Accordingly, the order that terminated his parental rights must be vacated, without the necessity of proving harmful error.

Appellant-Mother (**Mother**) and Cross-Appellant-Father (**Father**) appeal from the Decision and Order Terminating the Parental Rights of [Father] and [Mother] and Awarding Permanent Custody [HRS 587A] (**Order Terminating Parental Rights**), filed on

December 7, 2020, in the Family Court of the Fifth Circuit (**Family Court**).[1]  The Order Terminating Parental Rights terminated Mother and Father's parental rights to their two children, JM and ZM (**Children**).

I.   BACKGROUND

On April 16, 2019, Petitioner-Appellee-Cross-Appellee The Department of Human Services (**DHS**) filed a Petition for Temporary Foster Custody for custody of the Children (**Foster Custody Petition**).  DHS alleged that the Children were subject to imminent harm, harm, or threatened harm because their parents' substance abuse affected their ability to supervise, protect, or care for the Children.  The Foster Custody Petition was supported by a Safe Family Report and a Family Service Plan, both dated April 18, 2019, and received into evidence.

By orders of the Family Court dated April 22, 2019, and entered on April 24, 2019, separate attorneys were appointed to represent Mother and Father, effective as of April 18, 2019. Appointed counsel for Mother and Father were orally named at an April 18, 2019 hearing before the Family Court, and Parents requested a continuance to meet with their respective counsel, which was granted.  The Children had been placed in police protective custody on April 11, 2019, DHS was temporarily awarded foster custody, and a May 2, 2019 return date was set.

_____

[1]      The Honorable Edmund D. Acoba presided.

In conjunction with the Foster Custody Petition and related Safe Family Report, DHS reported that it had received a report on August 14, 2018, that Mother, Father, and other adults in the home were using drugs in the presence of the Children and that one child had stepped on a burning piece of amphetamine in the home. After a preliminary investigation and interviews, a DHS social worker requested that Mother and Father complete urinalyses after the social worker's visit with them. They said that they could not go that day because they were busy with errands; they requested to complete drug testing later. Mother failed to show for drug tests on March 8, 14, and 22, 2019. Father failed to show for a drug test on March 8, 2019. Mother was unable to produce a urine sample on March 13 and 15, 2019. Father tested positive for methamphetamine and amphetamine on March 13, 2019. On March 29, 2019, both parents failed to meet with DHS and did not maintain contact with DHS. DHS further reported that parents had heated verbal altercations and that the Children hide under the blankets when the arguments occur, that parents were evasive and refused to allow DHS access to the family home, and that on April 11, 2019, the police were called to assist DHS to assess the Children's safety. As noted, the Children were then placed in police protective custody.

Subsequent to the filing of the Foster Custody Petition, Mother and Father were directed in the initial Family Service Plan to participate in random drug testing. On May 2,

2019, it was reported that Mother tested positive for methamphetamine and Father admitted to using methamphetamine and tested positive for "OXY," which he attributed to prescribed Percocet. On May 16, 2019, it was reported that Mother tested positive for methamphetamine. On June 4, 2019, it was reported that Mother and Father did not show up for drug tests on April 22, May 2, May 6, May 14, May 23, and May 28, 2019. A no show is considered to be the same as a positive test.

On June 18, 2019, the Family Court entered an Order Establishing Jurisdiction and Awarding Foster Custody [HRS 587A] in which the Family Court awarded DHS foster custody of the Children as of June 13, 2019.

On July 3, 2019, it was reported Mother and Father did not show up for drug tests on June 3, 13, 18, and 27, 2019.

A July 16, 2019 assessment of Father stated he had a Moderate Methamphetamine Use Disorder and it was recommended he complete Intensive Outpatient Treatment and Aftercare.

On July 19, 2019, the Family Court entered an Order Establishing a Family Service Plan [HRS 587A] which ordered parents to follow a service plan dated April 18, 2019 (**April 2019 Service Plan**). The April 2019 Service Plan required Mother and Father to participate in substance abuse treatment and management, including random drug tests, a psychological evaluation and any recommended services, including parenting education.

On August 7, 2019, it was reported that Father did not show up for drug tests on July 2, 8, 16, 25, and 30, 2019, that Mother did not show up for drug tests on July 2 and 30, 2019, and that Mother tested positive for methamphetamine and amphetamine on July 11, 2019.

Father's August 15, 2019 Clinical Psychological Evaluation stated that Father believed removal of the Children was unwarranted and parents' drug use away from the Children was less of a concern than if it was done in the home. The evaluation stated that Father's "treatment prognosis is guarded due to his ambivalence toward addressing his drug issue. Until he can genuinely embrace the need to change and commit to a different way of living, he will not be in a position to improve his own functioning as a productive citizen, supportive partner, or a protective, responsible parent to his [Children]." It was recommended that Father begin substance abuse treatment, random drug screens, a support group for substance users, parent education after achieving sobriety, and couples counseling with Mother.

Mother's August 15, 2019 Clinical Psychological Evaluation stated that Mother believed that the removal of the Children was unwarranted and parents' drug use away from the Children was less of a concern than if it was done in the home. Mother admitted to cannabis and methamphetamine use and had not yet taken the first step toward recovery. Mother's "treatment

prognosis is guarded due to her ambivalence toward addressing her drug issue.  Until she can genuinely embrace the need to change and commit to a different way of living, she will not be in a position to improve her functioning as a productive citizen, supportive partner, or a protective, responsible parent to her children."  It was recommended that Mother engage in substance abuse assessment and treatment recommendations, random drug screens, a support group for substance users, parent education after achieving sobriety, and couples counseling with Father.

On September 23, 2019, it was reported that Mother and Father did now show up to drug tests on August 6, 15, 19, and 27, 2019.

On October 7, 2019, it was reported that Mother and Father did not show up to drug tests on September 3, 10, and 19, 2019, and that both parents tested positive for methamphetamine and amphetamine on September 24, 2019.

On October 8, 2019, the Family Court entered an order noting that Mother and Father failed to appear for an October 3, 2019 status hearing, although their attorneys were present, and Mother and Father were defaulted for their non-appearance.

On November 7, 2019, it was reported that Father did not show up for drug tests on October 1, 10, 15, 21, and 29, 2019.  Mother did not show up for drug tests on October 1, 10, 21, and 29, 2019, and tested positive for methamphetamine and amphetamine on October 15, 2019.

On November 27, 2019, at the conclusion of a Periodic Review Hearing, the Family Court entered an Order Continuing Foster Custody [HRS 587A], which ordered parents to follow a service plan, dated November 21, 2019 (**November 2019 Service Plan**). The November 2019 Service Plan required parents to participate in the same services as the April 2019 Service Plan.

On December 2, 2019, it was reported that Mother and Father did not show up for drug tests on November 4, 12, and 26, 2019, and on November 21, 2019, both parents admitted to using meth[amphetamine], instead of taking a drug test. On January 6, 2020, it was reported that Mother and Father did not show up for drug tests on December 2, 10, and 19, 2019, and both parents tested positive for methamphetamine and amphetamine on December 24, 2019. On February 4, 2020, it was reported that Mother and Father did not show up for drug tests on January 2, 14, 21, and 30, 2020, and both parents tested positive for methamphetamine and amphetamine on January 6, 2020.

A Status Hearing was held on February 13, 2020. Mother and Father failed to appear. On February 19, 2020, the Family Court entered an order noting the parents' failure to appear at the February 13, 2020 hearing and were defaulted for their non-appearance. The order stated that neither Mother nor Father had made progress toward resolving the problems that necessitated placement. The parties were ordered to appear at an Order to Show Cause Hearing and Periodic Review Hearing on May 14, 2020.

On March 16, 2020, it was reported that Mother and Father did not show up for drug tests on February 6, 13, 18, and 24, 2020. On April 7, 2020, it was reported that Mother and Father did not show up for drug tests on March 2, 10, 16, and 24, 2020.

Mother and Father both failed to appear at the May 14, 2020 hearing. On May 26, 2020, the Family Court entered an Order Continuing Foster Custody and Setting the Matter for a Termination of Parental Rights Hearing [HRS 587A], which noted the parents' failure to appear at the May 14, 2020 hearing and scheduled a Termination of Parental Rights Hearing for July 23, 2020. The Family Court again found that Mother and Father had made no progress toward resolving the problems that necessitated placement, and Mother and Father were ordered to follow a service plan, dated May 14, 2020 (**May 2020 Service Plan**), which continued prior services.

On June 24, 2020, DHS filed an Ex Parte [sic] Motion and Order for a Termination of Parental Rights Hearing (**Motion to Terminate Parental Rights**), which was served on counsel for parents.

On July 9, 2020, it was reported that Mother and Father did not show up for drug tests on June 1, 9, 18, and 30, 2020.

On July 23, 2020, the Family Court held a hearing on the Motion to Terminate Parental Rights. Mother entered the courtroom after the hearing began, but was present. Father did

not appear and the court informed his attorney that Father was defaulted for that hearing, and that Father's attorney would be released from the hearing, but the hearing would proceed with Mother.  Father's attorney then requested an opportunity, while the hearing was recessed for the court to address a different case, to be able to talk to Mother.  The court said that if Father showed up, he could be a part of the hearing, but that the court was going to proceed after the recess.

After the recess, Father still was not present and his attorney asked for a continuance based on counsel's understanding that both parents were working with a pastor on Kaua‘i and would be going to a "Teen Challenge" program, but counsel was unable to reach anyone who could confirm that information to DHS.  Father's counsel asked for a continuance to try to look into matters before Father's parental rights were terminated forever.  The court noted that the Children had been in foster care for over a year, that Father had been twice previously defaulted for failure to appear.  The Family Court again stated that Father would be defaulted and the court then discharged Father's attorney.  The court then indicated that the July 23, 2020 hearing would proceed as to Mother.

Brandi Yamamoto (**Yamamoto**) testified she is a DHS social worker; she first became involved in the case in March 2019, when there was a report of threat of abuse and neglect by Mother and Father.  When she first went to the family home to

investigate, she was denied entry to the home. She requested that Mother and Father take urinalyses, but both parents repeatedly missed them, even after she explained it might avoid filing a petition for foster custody if they entered into a safety plan. It was recommended that Mother and Father address substance abuse prior to parenting classes, so parenting classes were put on hold. She referred both parents to Women in Need (sometimes referred to as **WIN**), which would do a substance abuse assessment and random urinalyses every week. A substance abuse assessment was performed for Father but he did not initiate treatment. Father did not enter into any of the recommended treatments stemming from the Women in Need assessments. Mother was also referred to Women in Need for a substance abuse assessment and urinalyses. Mother completed a substance abuse assessment, but did not follow any of the recommendations.

Yamamoto had a chance encounter with parents in June 2020, and they informed her they would participate in drug treatment through Teen Challenge on the Big Island (Mother) and on Maui (Father), but they could not provide her with any documentation for the services. Yamamoto testified that the parents were not successful in housing themselves, which is an issue to consider in the Children's safe placement. Yamamoto stated that Father participated in ʻOhana time (visitation between parents and children), but he was not always engaged or consistent in participation. Mother was very engaged in face-to-

face visits, but there were some challenges in her not attending visits. Visits were eventually put on hold due to nonconfirmation. It was reported by the resource caregiver that during some phone visits, the parents would say that they need to charge their phone and would call back later, but then did not call back and left the Children waiting for a phone call. Yamamoto stated that it was important to return a call to the Children, because it shows dedication to the Children and it creates an emotional issue when the Children are eager to speak with parents but are disappointed by not receiving a call and may feel unwanted.

Yamamoto was concerned about Mother stating that she intended to enter drug treatment without providing Yamamoto with documentation because Mother had previously expressed her intent to enter treatment, but failed to follow through. It was Yamamoto's opinion that providing parents additional time would negatively affect the Children because they had been in foster care for over a year and had stability since entering foster care. It was also Yamamoto's opinion that it was not reasonable for the Children to wait for Mother to complete drug treatment because they had been in foster care for over a year and they deserve a safe and stable placement. She said that as children get older, they tend to bond with the people they live with and breaking that bond would be detrimental to their mental health and well-being. JM was ten years old, ZM was five years old, and

it was DHS's position that the court should terminate Mother and Father's parental rights.

On cross-examination, DHS objected, based on lack of relevance, when Yamamoto was asked if she was familiar with other cases at DHS where parents went into treatment after 13 months of noncompliance with a treatment recommendation. Mother's counsel stated:

> Yeah, the relevance is that the Department has taken the position in the past that people who have taken as long as two years to get into treatment have -- and done fewer services than my client has done -- have been appropriate for continued services. That's -- I'm personally familiar with similar recommendations from DHS in the past, so that's why I'm asking.

The Family Court sustained the objection. The hearing was continued before Yamamoto's testimony was complete. The Termination of Parental Rights hearing was set to continue on September 11, 2020.

Neither Mother nor Father appeared at the September 11, 2020 continued hearing. In addition, Yamamoto was out on medical leave. The Family Court further continued the hearing to October 8, 2020.

On October 8, 2020, a continued Termination of Parental Rights hearing was held. Neither Mother nor Father were present at the onset of the hearing (1:02 p.m., according to the court's minutes; three calls were then made outside the courtroom at 1:04 p.m.) and the court defaulted them for their non-appearance and excused Mother's attorney (1:06 p.m.). The Family Court then accepted DHS's offer of proof that Yamamoto would testify that

Mother and Father had not made progress in the reunification plan, were not presently willing and able to provide a safe family home for the children and parents would not become able within a reasonable amount of time, even if given further time to do services, to become willing and able to provide a safe family home. The Family Court then found that the State presented clear and convincing evidence that the parents are not able to provide a safe family home. Approximately two minutes after Mother and Father were defaulted (1:08 p.m.), Mother's attorney re-entered the courtroom with both Mother and Father.

The Family Court addressed Mother and Father and explained that they were defaulted for their nonappearance. The court addressed Father and informed him that, because he was previously defaulted and his attorney was released, he would have to file a motion to set aside the default. The court indicated that it would allow Father to listen to the evidence, but would not allow him to present evidence or cross-examine. The court addressed Mother and noted that she had not appeared at the last hearing, but since the State was not ready to proceed, the matter was continued. The court set aside the default for Mother's nonappearance at the onset of the hearing.

As Father's attorney had been previously discharged by the court, Father was without counsel. The court informed Father that due to his absence at several proceedings, his attorney was released, and he should have contacted his attorney before

showing up so maybe the attorney could have worked to set aside the default and Father could participate. The court added that, "unless you find good cause -- file your motion and the Court finds good cause, [the] Court will not set aside the default." Father then left the courtroom.

Mother's attorney was then permitted to cross-examine Yamamoto. Yamamoto testified she received a Teen Challenge residential program acceptance letter for Mother, dated August 8, 2020, and received by DHS on September 28, 2020. Yamamoto had made no effort to contact Teen Challenge about the letter and conducted no investigation into the program. The Guardian Ad Litem for the Children asked Yamamoto whether, since the August letter, Mother had come in to Yamamoto's office or called Yamamoto or updated Yamamoto concerning going to drug treatment or the Teen Challenge program. Yamamoto said no, she had not been provided any information since the case began that Mother had entered any type of substance abuse treatment. In response to a further question, Yamamoto stated that the Teen Challenge letter was unsigned.

Mother then testified. When asked what steps she had taken over the past year to secure treatment for drug abuse, Mother stated that she had been trying to get into Teen Challenge. She was also now trying to get into the WIN House, while waiting to get into Teen Challenge which should be available in a couple of weeks. She first contacted WIN House in

September 2020. She first contacted Teen Challenge five months before the October 8, 2020 hearing. She was waiting for her original birth certificate, so she could get a state ID (hers was expired), which she needed for the Teen Challenge program. The Teen Challenge program is a one-year residential program.

On cross-examination, Mother testified that she had started parenting classes, but she was not going because "it got stopped." She had not done couples therapy. Mother acknowledged that the Children had been in foster care for over a year and that she did not know if Teen Challenge would allow her children to live with her. If not, she would try to find a residential treatment that accepts children. Mother also stated Father would be going to Teen Challenge the next week. Mother admitted that, while she was waiting for Teen Challenge, she could have been attending services through WIN House but did not. She also admitted to not doing random urinalyses. Mother stated that she had participated in E Ala Hou three times, but only went three out of six weeks since she started because of transportation issues. Mother explained that the E Ala Hou meetings are Christian-based meetings with people who are in remission or who are drug addicts and they talk about how Christ can help you get through your drug problems.

After Mother's testimony, the Family Court set deadlines for written closing arguments: October 23, 2020, for DHS; October 28, 2020, for Mother; and November 4, 2020, for a

DHS rebuttal.  A periodic review hearing was set for November 5, 2020.

On October 21, 2020, Mother filed Mother's Motion to Reopen Trial (**Motion to Reopen**), pursuant to Rule 10 of the Hawaiʻi Family Court Rules (**HFCR**) and the court's inherent power. Mother requested to reopen the hearing to present additional evidence that Mother recently secured a place to live at WIN House, was actively engaged in treatment, and was drug free for 10 days as of October 20, 2020.  In addition, Father had gone to a facility on the Big Island for treatment.

According to court minutes, a hearing was held on November 5, 2020.  The minutes reflect an additional exhibit that would be received concerning Mother's leaving WIN House without a clinical discharge; Mother's counsel noted that Mother was still participating in nonresidential services.  Prior to the hearing, on November 5, 2020, shortly after an order was entered reappointing Father's counsel, Father filed a motion to set aside his default (**Motion to Set Aside**).  According to the hearing minutes, DHS noted that it was in agreement to allow Mother to present further evidence and that DHS would stipulate to set aside the default against Father.  The court noted it had not seen Father's motion[2] and therefore would not entertain a stipulation at that time.  The court denied the Motion to Reopen

---

[2] Father's Motion to Set Aside was scheduled for hearing on December 10, 2020.

Trial due to a lack of new evidence or additional evidence to support re-opening.  No transcript of the November 5, 2020 hearing is in the record on appeal.

On November 19, 2020, Mother filed a Motion to Reconsider Order Denying Motion to Reopen (**Mother's Motion for Reconsideration**), pursuant to HFCR Rule 59 and the court's inherent power.  Mother again urged the court to take additional testimony, noting that there was nearly eight months left, if she was allotted the "full two years" to provide a safe family home. Mother filed a declaration stating that she had been actively engaged in intensive outpatient treatment through WIN House since mid-October.  She represented that she had not used any drugs since October 13, 2020, and that she had several drug tests since then and "none of those tests showed any drugs in my system other than the leftover amounts from my October 13, 2020 use."[3]  Mother also represented that she had taken several steps to secure her own housing and located at least one place where she believed she might be able to reside in the near future.  On the same day, the Family Court entered a written order denying the Motion to Reopen.

On December 3, 2020, Father filed a Motion for Reconsideration, Amendment and/or Relief from Order Terminating

_____

   [3]   We note that Mother's November 18, 2020 attestation that she used drugs on October 13, 2020, appears to be inconsistent with Mother's October 20, 2020 call to her attorney where she told him she had been drug free for ten days, as reflected in counsel's declaration in conjunction with the Motion to Reopen.

Parental Rights (**Father's Motion for Reconsideration**), pursuant to HFCR Rules 7, 52, 59, and 60 and moved the Family Court "to reconsider, amend and/or provide relief from its Order issued November 5, 2020, terminating Father's parental rights."  Father also filed a memorandum in support of his Motion to Set Aside. Father argued that there was good cause to set aside his default and to reconsider the termination of Father's parental rights by default in light of the significant interest at stake and no prejudice to DHS.  Father contended that there was excusable neglect because his substance abuse addiction constituted an illness that prevented him from being able to effectively and meaningfully participate in the case.  Father also claimed the default was equivalent to a sanction, the entry of default is disfavored given the fundamental liberty interest at stake, and the State would not be prejudiced by reopening the matter. Father also stated that he had meritorious defenses that warranted setting aside the default, specifically, that he was currently clean and sober and participating in substance abuse assessments with the McKenna Recovery Center, and that he and Mother were staying with family, saving money, and preparing to rent a house appropriate for the Children.  Father argued that the pandemic had made it difficult to find a recovery program that was accepting applicants and that he enjoyed and would have continued to engage in parenting classes but for DHS's cancellation of the classes.

On December 7, 2020, the Family Court issued the Order Terminating Parental Rights. The Family Court found that Mother and Father were not presently willing and able to provide a safe family home, even with the assistance of a service plan, it was not reasonably foreseeable that Mother and Father would become willing and able to provide a safe family home within a reasonable period of time, the proposed permanent plan of adoption was in the best interest of the children, the children entered foster custody on June 13, 2019, and the parents had failed to resolve their substance abuse issues.

On December 8, 2020, Mother filed a Notice of Appeal from the December 7, 2020 Order Terminating Parental Rights.

On December 10 and 16, 2020, the Family Court held hearings on Mother's Motion for Reconsideration, the Motion to Set Aside, and Father's Motion for Reconsideration. With respect to the Motion to Set Aside, Father's counsel rested on the submitted declaration. The Family Court recounted the procedural history of the case, noting that when trial started on July 23, 2020, Father's counsel stated he was not able to reach Father, Father did not appear, three calls were made outside the courtroom, Father was defaulted, and counsel was released. The court stated that although the State was not ready to proceed on September 11, 2020, due to the witness's medical leave, neither parent appeared at the September 11, 2020 hearing for continued trial. On October 8, 2020, parents failed to appear (on time).

Mother eventually appeared with her counsel, so trial was held. The Family Court recalled that Father had been defaulted, he did not have counsel, but requested an attorney to be present, but it was not in the best interest of the Children to continue trial. The court noted that it told Father he could sit in, but not participate, because he was defaulted. The court stated that Father never filed a motion to set aside the default.[4] The court pointed out that Father left the hearing after being told he could not participate. The Family Court found that Father did not show good cause because there was no explanation for failing to appear on July 23, 2020, when trial started, and it prejudiced the State and the Children to continue the matter any further. The Family Court reiterated that, at the time of the October 8, 2020 hearing, the Children had been in foster care for almost sixteen months, and it was not in the best interest of the Children to continue the matter any further.

Mother's counsel also rested on Mother's Motion for Reconsideration, except to note that Mother was still doing well and she was still engaging in services and testing. After DHS offered to enter Exhibit 85 through 89, Mother's counsel stated, "So in light of his offer, I wouldn't object to those being introduced and I don't think that there would be a need to

---

[4] We note that this is not exactly correct, although Father had not filed a motion to set aside a default prior to the October 8, 2020 hearing. We further note that the court discharged Father's attorney at the July 23, 2020 hearing, and Father was without counsel until his previously-appointed attorney was reappointed on November 5, 2020.

present an evidentiary case in light of that." Exhibits 85 through 89 were admitted into evidence. Mother's offer of proof as to her testimony was that she was likely to secure stable housing in Kalāheo by the next week, Mother was attending substance abuse classes, and she was looking for employment. Mother was sworn in and her offer of proof was accepted. Mother argued, *inter alia*, that due to the unusual circumstances of the COVID pandemic, which made getting mandatory documents and employment difficult, and the fact that two years had not elapsed, Mother's progress after trial should be considered and the case should be reopened so she could present additional testimony. DHS pointed to the complete lack of progress before trial. The Guardian Ad Litem pointed out that the parents were not denied any visits they confirmed they would attend, but failed to show up on time, failed to communicate, and failed to confirm visits. The Family Court noted in paragraph 4 of Mother's declaration she stated that several urinalyses did not show any drug use other than leftover amounts from October 13, 2020, but that trial ended on October 8, 2020; so, Mother was still using drugs at the time that trial was concluded. Although Mother entered intensive outpatient treatment through WIN House in mid-October, it was after trial. The Family Court denied Mother's Motion for Reconsideration.

Although the Family Court had denied Father's Motion to Set Aside, Father was allowed to argue Father's Motion for

Reconsideration. DHS noted that it understood that the court's practice was when a default was entered for nonappearance, it was for a particular day, not "for the life of the case." DHS posited that the court was making a distinction here because Father failed to show up for trial days. Father's counsel made an offer of proof that Father would testify he is clean and sober, participating with McKenna Recovery Center in classes and random drug tests, and he and Mother were attending parenting classes with Child & Family Services. Father admitted he went to the Big Island for treatment, but left before being clinically discharged. As further proof, Father would also testify that parents are waiting to move into a house in Kalāheo, Father started a full-time job doing roofing work, and Father would be able to provide a safe family home within two years of July 2019, when the Children were removed. Father was sworn in and Father's offer of proof was accepted. Father argued that he should have a chance to present evidence because it is in the Children's best interest, that there were mitigating factors due to the pandemic, and it was not close to two years yet. The Family Court denied Father's Motion for Reconsideration and noted parents made progress after its ruling, instead of from the beginning, and Father was provided due process in that he was given notice, an attorney, notice was provided to the attorney, and the attorney lost contact with Father. Father's Motion for Reconsideration was denied.

On December 21, 2020, the Family Court entered an Order Continuing Permanent Custody [HRS 587A] which, *inter alia*, denied Mother's Motion for Reconsideration, Father's Motion to Set Aside Default, and Father's Motion for Reconsideration. On December 23, 2020, the Family Court issued its Findings of Facts Regarding Trial on Termination of Parental Rights of [Father and Mother] [HRS 587A].

On December 31, 2020, Father filed a Notice of Appeal from the December 7, 2020 Order Terminating Parental Rights and the December 21, 2020 Order Continuing Permanent Custody.[5]

II. POINTS OF ERROR

Mother raises four points of error on appeal, contending that: (1) the Family Court erred by precluding cross-examination of Yamamoto regarding her recommendations in other cases; (2) Findings of Fact (**FOFs**) V and Z are clearly erroneous; (3) the Family Court clearly erred by finding that there was clear and convincing evidence that it was not reasonably foreseeable Mother would become willing and able to provide the Children with a safe family home within a reasonable period of time and Mother had not made progress towards resolving the problems that necessitated placement of the Children; and (4) the Family Court abused its discretion by refusing to reopen the

---

[5] Father's Notice of Appeal was docketed as a cross appeal since it was filed in CAAP-20-0000748 after Mother filed a Notice of Appeal.

hearing on the Motion to Terminate Parental Rights to allow Mother to provide additional evidence of her progress.

Father raises four points of error on appeal, contending that: (1) the Family Court abused its discretion by denying Father the right to meaningfully participate with counsel in the hearing on the Motion to Terminate Parental Rights, and thereafter terminating his parental rights by default; (2) the Family Court abused its discretion by refusing to reconsider termination of Father's parental rights by default; (3) there was no clear and convincing evidence that Father was not presently willing and able to provide a safe family home, and it was not reasonably foreseeable that Father would become willing and able to provide a safe family home with the assistance of a service plan within a reasonable period of time; and (4) FOFs V and Z are clearly erroneous.[6]

III. APPLICABLE STANDARDS OF REVIEW

Hawaii Revised Statutes (**HRS**) § 587A-33(a) (2018) governs the termination of parental rights and provides in relevant part, as follows:

> (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
>
> (1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child

---

[6] In his Reply Brief, Father more specifically argues that he should have been appointed counsel at the continued hearing on October 8, 2020, after his counsel was previously discharged due to his default and non-appearance, but instead counsel was only reappointed after his parental rights were terminated.

> with a safe family home, even with the
> assistance of a service plan;
>
> (2)  It is not reasonably foreseeable that the
> child's parent whose rights are subject to
> termination will become willing and able
> to provide the child with a safe family
> home, even with the assistance of a
> service plan, within a reasonable period
> of time, which shall not exceed two years
> from the child's date of entry into foster
> care; [and]
>
> (3)  The proposed permanent plan is in the best
> interests of the child.

"Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion."  In re Doe, 95 Hawaiʻi 183, 189, 20 P.3d 616, 622 (2001) (citations and internal quotation marks omitted).

> [T]he family court's determinations . . . with respect
> to (1) whether a child's parent is willing and able to
> provide a safe family home for the child and (2)
> whether it is reasonably foreseeable that a child's
> parent will become willing and able to provide a safe
> family home within a reasonable period of time present
> mixed questions of law and fact; thus, inasmuch as the
> family court's determinations in this regard are
> dependant upon the facts and circumstances of each
> case, they are reviewed on appeal under the clearly
> erroneous standard.  Likewise, the family court's
> determination of what is or is not in a child's best
> interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway
> in its examination of the reports concerning a child's
> care, custody, and welfare, and its conclusions in
> this regard, if supported by the record and not
> clearly erroneous, must stand on appeal.

Id. at 190, 20 P.3d at 623 (citations, quotation marks, and brackets omitted).

> The family court's FOFs are reviewed on appeal
> under the clearly erroneous standard.  A FOF is
> clearly erroneous when (1) the record lacks
> substantial evidence to support the finding, or (2)
> despite substantial evidence in support of the
> finding, the appellate court is nonetheless left with
> a definite and firm conviction that a mistake has been

> made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.
>
> On the other hand, the family court's COLs are reviewed on appeal *de novo*, under the right/wrong standard. COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.

Id. (citations, quotation marks, and ellipsis omitted).

Unchallenged findings of fact are binding on appeal. In re Doe, 99 Hawaiʻi 522, 538, 57 P.3d 447, 463 (2002).

"We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." State v. Ui, 142 Hawaiʻi 287, 292, 418 P.3d 628, 633 (2018) (citation omitted).

IV. DISCUSSION

A. Mother

1. *Cross-examination of Yamamoto*

On appeal, Mother argues that the Family Court abused its discretion when it did not permit her to conduct "searching cross-examination" of an expert witness, Yamamoto, about whether her recommendations were different in other, similar cases. Mother contends that, because she was not allowed such cross-examination, she was improperly prevented from adducing evidence about the reliability and trustworthiness of the State's expert. In addition, Mother submits that she was precluded from

performing a "broad cross-examination of an expert" as permitted by Rule 702.1 of the Hawaiʻi Rules of Evidence (**HRE**).[7]

However, at the evidentiary hearing below, Mother's response to DHS's relevance objection was:

> Yeah, the relevance is that the Department has taken the position in the past that people who have taken as long as two years to get into treatment have -- and done fewer services than my client has done -- have been appropriate for continued services. That's -- I'm personally familiar with similar recommendations from DHS in the past, so that's why I'm asking.

Mother did not argue in the Family Court that the purpose of the questioning was to challenge the reliability and trustworthiness of Yamamoto's testimony. Therefore, Mother's claim that HRE Rule 702.1 was violated is waived.[8]

---

[7] HRE Rule 702.1 states:

**Rule 702.1  Cross-examination of experts.**
(a)  General.  A witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be cross-examined as to (1) the witness' qualifications, (2) the subject to which the witness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion.

(b)  Texts and treatises.  If a witness testifying as an expert testifies in the form of an opinion, the witness may be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication only if:

> (1)  The witness referred to, considered, or relied upon such publication in arriving at or forming the witness' opinion, or

> (2)  Such publication qualifies for admission into evidence under rule 803(b)(18).

[8] We note that Mother sought to introduce evidence that parents in other termination of parental rights cases were given at least two years to participate in services before DHS moved to terminate their parental rights because HRS § 587A-33 requires, *inter alia*, clear and convincing evidence that it is not reasonably foreseeable a parent "will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two

2.    *FOFs V and Z*

Mother challenges FOFs V and Z, which state:

V    Mother and Father continue to be inconsistent
     with participating in drug testing and failed to
     appear for drug testing on November 23, 2020, a
     failure to appear is considered a positive test
     by the Court;

. . . .

Z    Mother and Father have failed to engage in
     couples counseling, therapy or participate in a
     sober support group[.]

Mother argues that FOF V is clearly erroneous because Mother "missed a drug test on November 23, 2020 because the DHS stopped affording Mother drug testing due to termination of her parental rights."  However, DHS submitted to the Family Court the WIN-certified reports that Mother tested negative on November 2, 12, and 30, 2020, but did not show up for testing on November 23, 2020.  The reports indicate Mother's tests on November 23 and 30, 2020, as well as the tests earlier in November, were court ordered.  Thus, substance abuse testing was not terminated in November 2020.  Mother's counsel was mistaken, to the extent he claimed that, when the order terminating Mother's parental rights was orally announced, parents "were cut off from substance abuse testing."  The Order Terminating Parental Rights was not issued

---

years from the child's date of entry into foster care[.]"  However, as Mother recognizes, "the two-year time limit imposed by Chapter 587A does not require that the full two years be allowed in every case[.]"   HRS § 587A-7 (2018) specifies the safe family home factors to consider "when determining whether a child's family is willing and able to provide the child with a safe family home," none of which involve comparing other parents or cases.  These factors are specific to the particular child, family, and other circumstances at issue in the particular case before the court.  Thus, Mother's inquiry into other cases was not relevant and the objection to relevance was properly sustained.

until December 7, 2020. Therefore, FOF V is not clearly erroneous as to Mother.

Mother argues that FOF Z is clearly erroneous because Mother testified she engaged in a sober support group, E Ala Hou. Mother testified:

> Q. Okay. So now, [Mother] while you've been waiting to get into -- to fly over to treatment on the Big Island at Teen Challenge, you could have been attending services through the WIN House?
>
> A. Uh-huh.
>
> Q. But you're not?
>
> A. No.
>
> Q. You're not doing the random urinalysis? You're not --
>
> A. I haven't.
>
> Q. -- doing groups?
>
> A. I've been doing the, yeah, the whole one, but that's only on Mondays.
>
> Q. Okay. But you haven't participated in anything --
>
> A. No.
>
> Q. -- else?
>
> A. No. But the -- the ladies at WIN House said that when I get in there, they can help me get into the intensive care groups or meetings they have three times a week.
>
> Q. But you haven't entered into any of the other programs at WIN?
>
> A. No.
>
> Q. Okay. And the E Ala Hou program, that's through Child & Family Services?
>
> A. No.
>
> Q. No. E Ala Hou is --
>
> A. I got in that through the church that we were going for Teen Challenge to.
>
> Q. Through Pastor Kua?

A.   Yes.

Q.   And how long have you been attending those services?

A.   I went three times so far.

Q.   Three times.  And it's once a week?

A.   Yeah.

Q.   So you've gone for the last three weeks?

A.   I didn't go the -- the week before this one or this one.  I'm going to go this week, this next coming week.

Q.   So you haven't been going every week, but you went --

A.   Yeah.

Q.   -- three times?  Is that right?

A.   Yeah.

Q.   Okay.  So you --

A.   Because it's all the way in Kekaha, so if I get -- have a ride or the church -- if I call the church and ask them for a ride, they'll give me a ride from --

Q.   So when did you start going?  When was the first E Ala Hou session you went to?

A.   I went -- like the first time was like four -- five or six weeks ago I started.

Q.   Okay.  So in August?

A.   Yeah.  At the end of August.

Q.   Okay.  So between the end of August and today, you've gone three times?

A.   Yeah.

Q.   But it meets weekly?

A.   Yeah.

Q.   Is that right?

A.   Yeah.

Q.   Okay.  So you've gone to less than half of the times that you're supposed to have gone, right?

A.   I went -- like three out of six weeks I went since I started.

Q.  Okay.  But the end of August.  There's all of
September, right?  And then this is the first week of
October.  Okay.  So six weeks.

A.  Uh-huh.

Q.  You're saying three out of six?

A.  Uh-huh.

Mother further testified "they're meetings with people who are in remission or who are drug addicts, and they talk about Christ and drug problems and how Christ can help you get through it."

While it appears that the Family Court could have been more precise by acknowledging Mother's limited and inconsistent participation in the E Ala Hou program, viewing the entirety of the record of Mother's lack of actual engagement, we cannot conclude that the Family Court clearly erred in its findings as to Mother in FOF Z.

3.  *The termination of Mother's parental rights*

Mother argues that the Family Court clearly erred by finding that there was clear and convincing evidence that it was not reasonably foreseeable that Mother would become willing and able to provide the Children with a safe family home within a reasonable period of time, and Mother had not made progress towards resolving the problems that necessitated placement of the Children.  Mother submits that it was premature to determine she had not made progress because, when the Family Court announced its ruling, she still had nine months until the two-year period ended at the time her parental rights were terminated.

As the Background of this case recounts, Mother's substance abuse, and the resulting harm, imminent harm, or threatened harm to the Children was first reported to DHS in August of 2018. The Children entered foster care on June 13, 2019, after numerous failed and missed drug tests and parents' failure to meaningfully engage with DHS.

Unchallenged findings include that "Mother and Father consistently failed to appear for testing, tested positive for amphetamines/methamphetamines or admitted to using amphetamines/methamphetamines, in the 18 months since the petition was filed on April 16, 2019," (FOF S) and "Mother and Father despite, multiple substance abuse evaluations and opportunities to participate in substance abuse treatment, have failed to complete treatment, and have never consistently maintained sobriety," (FOF X). It was not until October 8, 2020, that Mother testified that she decided to participate in Teen Challenge on the Big Island for drug treatment. There had been certain hurdles for Mother's entry into that particular program, but Mother provided no good reason for not having engaged in other available substance abuse services prior to that time. Notably, at the time of Mother's October 8, 2020 testimony, she reported that the Teen Challenge was a year-long program, and she had not yet started it. Thus, even if Mother had entered and successfully completed that program, she would not have addressed

her substance abuse issues until at least October 2021, well beyond two years after the Children entered foster care.

On the record in this case, we cannot conclude that the Family Court clearly erred in determining that it was not reasonably foreseeable that Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from when the Children entered foster care on June 13, 2019.  It was not reasonably foreseeable that providing Mother until June 2021 to address her safety issues would have resulted in Mother demonstrating that she would become willing and able to provide a safe family home.  Therefore, we reject Mother's argument that she was not provided with a reasonable period of time; it was not premature for the Family Court to determine that Mother had not made progress in addressing her safety concerns, even though it was nine months prior to the expiration of the maximum two-year period which could be considered reasonable.

4. *Motion to Reopen*

On October 21, 2020, less than two weeks after the completion of the evidentiary hearing, Mother requested that the Family Court reopen trial to allow additional testimony concerning her entry into residential treatment at WIN House and Mother's representation to her attorney that she had been drug free for ten days.  It appears that, even prior to the November 5, 2020 hearing on Mother's Motion to Reopen, she had left WIN

House without a clinical discharge.  We cannot conclude that the Family Court abused its discretion in denying this motion.  <u>See</u> <u>State v. Christian</u>, 88 Hawaiʻi 407, 417, 967 P.2d 239, 249 (1998) (permitting or disallowing the reopening of a case is discretionary).

On November 19, 2020, Mother's Motion for Reconsideration was filed, again requesting that the Family Court reopen trial and take additional testimony.  Mother cited <u>Doe v. Doe</u>, 98 Hawaiʻi 144, 156, 44 P.3d 1085, 1097 (2002), which held that a family court erred by denying a motion for new trial, as well as <u>In re TW</u>, 124 Hawaiʻi 468, 474, 248 P.3d 234, 240 (App. 2011), where this court noted that a short continuance would not have resulted in any substantial prejudice or unduly infringed upon the court's need to manage its docket.  Essentially, Mother argued that the Family Court abused its discretion in denying the October 21, 2020 Motion to Reopen.

In <u>Doe</u>, the supreme court held that the family court abused its discretion by denying a HFCR Rule 59(a) motion for new trial by misapplying the good cause standard applicable to HFCR Rule 59(a) motions and refusing to extend testimony beyond a three-hour time limit to allow other witnesses to testify.  <u>Doe</u>, 98 Hawaiʻi at 155-56, 44 P.3d at 1096-97.  <u>Doe</u> is distinguishable from this case because the Motion to Reopen was not an HFCR Rule 59(a) motion for new trial, Mother was not limited by the Family Court in presenting pertinent evidence, Mother sought to present

35

her own additional testimony instead of testimony by other witnesses who were prevented from previously testifying, and the testimony she requested to present regarded events subsequent to the closing of the hearing instead of evidence that existed at the time of the hearing. Indeed, the testimony Mother sought to present was that she had begun a different treatment program than the one she had told the court she was going to start, only 13 days earlier, and Mother had again changed programs prior to the hearing on the Motion to Reopen.

In In re TW, a family court defaulted a parent for failure to appear at one hearing, granted a motion for permanent custody based on the default, and denied the parent's motion to set aside the default. 124 Hawaiʻi at 469, 248 P.2d at 235. This court held that the Family Court abused its discretion by imposing a default sanction for a single non-appearance and there was nothing in the record to suggest a short continuance to permit counsel to determine the parent's whereabouts and secure her attendance would have resulted in any substantial prejudice to DHS or the children. Id. at 474, 248 P.2d at 240. In this case, Mother was not sanctioned for failure to appear. Although Mother was initially defaulted on October 8, 2020, for failing to appear for further hearing on the Motion to Terminate Parental Rights, her default was set aside when she appeared a few minutes later. Therefore, In re TW is inapplicable.

Here, Mother requested that the Family Court reconsider its rejection of her October 21, 2020 request to reopen the case to present Mother's further testimony about her post-trial, initial steps, into substance abuse treatment and (short-term) sobriety. While DHS and the Family Court encouraged Mother to continue to address her substance abuse problems at the hearing on Mother's Motion for Reconsideration, Mother's offer of proof was that she was likely to secure stable housing (not that she had secured housing), she was attending substance abuse classes (not that she had been successfully discharged from a substance abuse program), and that she was looking for employment (not that she was employed). Mother admitted having done drugs post-trial, on October 13, 2020 (after previously reporting to her lawyer on October 20, 2020, that she had not done drugs for ten days), and as the Family Court noted, she failed to show up for drug testing on November 23, 2020. Based on the record in this case, we cannot conclude that the Family Court abused its discretion by failing to reconsider the denial of the Motion to Reopen.

B.  Father

1.  *The termination of Father's rights by default*

Father argues, *inter alia*, that the Family Court abused its discretion by denying Father the right to meaningfully participate, with counsel, in the October 8, 2020 evidentiary hearing and terminating his parental rights by default. Father's further argument on appeal – that had he been permitted to

37

participate at the October 8, 2020 hearing he would have shown that it was his substance abuse that prevented him from showing up and participating in the case earlier – is not compelling, especially in light of the fact that the substance abuse was the main reason that these parents were unable to provide the Children with a safe family home.  However, as argued more thoroughly in his Reply Brief, Father's ability to even make that argument, or any argument, was severely impacted by his lack of legal representation.

Hawaiʻi appellate courts have repeatedly recognized that parents have a substantive liberty interest in the care, custody, and control of their children that is protected by the due process clause of article I, section 5 of the Hawaiʻi Constitution.  See, e.g., In re Doe, 99 Hawaiʻi at 533, 57 P.3d at 458; In re T.M., 131 Hawaiʻi 419, 421, 319 P.3d 338, 340 (2014); In re L.I., 149 Hawaiʻi 118, 482 P.3d 1079 (2021); In re TW, 124 Hawaiʻi 468, 248 P.3d 234 (App. 2011).  The United States Supreme Court has similarly recognized these rights as being protected by the Fourteenth Amendment to the United States Constitution.  Troxel v. Granville, 530 U.S. 57, 65 (2000) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").

In In re T.M., the Hawaiʻi Supreme Court held that "parents have a constitutional right to counsel under article I,

section 5 in parental termination proceedings and that from and after the filing date of this opinion, courts must appoint counsel for indigent parents once DHS files a petition to assert foster custody over a child."  131 Hawaiʻi at 421, 319 P.3d at 340.  The court explained that if the mother in that case had been appointed an attorney sooner, she might have been able to comply with the terms of the family plan and provide her family with a safe home, possibly avoiding the termination of her parental rights.  Id. at 432-33, 319 P.3d at 351-52.

In In re L.I., the Hawaiʻi Supreme Court held that family courts must appoint counsel for indigent parents even earlier (where applicable), when DHS files a petition for family supervision, because their parental rights are already substantially affected at that point.  149 Hawaiʻi at 122, 482 P.3d at 1083 (citation omitted).  The court further held that the failure to do so was structural error, requiring vacatur without the necessity of proving harmful error.  Id. at 122-23, 484 P.3d at 1083-84.  Citing In re T.M., the court noted that "an attorney is essential to protect an indigent parent's liberty interest in the care, custody and control of his or her children."  Id. at 122, 484 P.3d at 1083 (citation and internal quotation marks omitted).  The gravamen of this decision, as well as its predecessors, is that such an attorney is essential throughout proceedings that could result in the termination of parental rights, and we so hold.  Representation is so essential that

39

failure to provide counsel to indigent parents facing possible termination of their parental rights is structural error that cannot be deemed harmless error.  See id. at 122-23, 482 P.3d at 1083-84 (citation omitted).

In this case, there is no mystery in the Family Court's dim view of Father's lack of progress in addressing his substance abuse issues, lack of comprehension of the resulting harm to the Children, which was exacerbated by inconsistent visitation and communication with the Children, lack of participation at multiple hearings, and failure to show up on time to the second day of the evidentiary hearing to terminate his parental rights.

That said, it is not clear why at the July 23, 2020 hearing, when Father did not appear in the first instance, Father was defaulted and Father's counsel was "released" for the hearing, but after counsel asked for a continuance to confirm the details of Father's treatment plan, the Family Court not only reiterated that Father was defaulted, but also discharged Father's attorney from the case, leaving Father unrepresented, although the issue of the termination of his parental rights was not yet decided.  We note that Father had previously failed to appear and Father was "defaulted," but apparently only for proceedings before the court on that day.  Nothing in the record of the July 23, 2020 hearing indicated that the default against Father was for the duration of the termination proceedings.  That only became clear on October 8, 2020, when the Family Court

informed Father, who was unrepresented at that point, that he could not participate further in the termination proceedings unless he filed a motion to set aside his default and the court found good cause.

We decline to speculate as to the various ways having continuous representation might have benefitted Father, in and outside the courtroom. We observe, however, when the Family Court defaulted Father for nonappearance (being late) to the October 8, 2020 hearing, Father did not have an attorney present to possibly explain why he (and Mother) arrived six minutes after the hearing started. Nor did Father have counsel present to address the court when it announced that Father now would have to file a motion to set aside the default, and the court would have to find good cause, before Father could participate any further in the proceedings to terminate his parental rights. If an attorney had been present, he or she might have advised Father to stay for the rest of the proceedings.[9] It also appears that the discharge of Father's attorney led or at least contributed to the delay in Father's ability to file a motion to set aside default. As noted above, Father's November 5, 2020 Motion to Set Aside was filed less than two hours after the order reappointing his attorney was entered, presumably because counsel was not

---

[9] When the Family Court heard Father's Motion to Set Aside and Father's Motion for Reconsideration on December 16, 2020, the court pointed to, *inter alia*, Father's departure from the October 8, 2020 hearing in its explanation for the denial of Father's requests for relief.

authorized to proceed on Father's behalf prior to the entry of the new order of appointment.  This led to entry of the December 7, 2020 Order Terminating Parental Rights before the hearing on Father's Motion to Set Aside was heard on December 10 and 16, 2020.

We recognize, however, that these potential benefits and consequences relate only to the issue of whether or not any error in conducting termination proceedings against Father after discharging his attorney substantially affected Father's rights, *i.e.*, were harmful.

However, based on the Hawaiʻi Supreme Court's decisions concerning the due process afforded to parents facing possible termination of their parental rights, particularly In re L.I., we hold that the Family Court's discharge of Father's attorney during the pendency of these proceedings, prior to the Family Court's decision on DHS's Motion to Terminate Parental Rights, violated Father's due process rights and was structural error. Accordingly, with respect to Father, the Order Terminating Parental Rights must be vacated without the necessity of proving harmful error.  See In re L.I., 149 Hawaiʻi at 122-23, 482 P.3d at 1078-79.  In addition, although we have rejected Mother's contentions that the Family Court erred with respect to the termination of her parental rights, we conclude that the Order Terminating Parental Rights should be vacated in its entirety to ensure that the Family Court can consider all factors that might

aid in determining whether a particular permanent plan is in the best interest of the Children.[10]

## 2. *Father's Other Arguments*

In light of our decision to vacate the Order Terminating Parental Rights, we need not address Father's other arguments on appeal.

## V. CONCLUSION

For these reasons, the Family Court's December 7, 2020 Order Terminating Parental Rights is vacated, and this case is remanded to the Family Court for further proceedings.

On the briefs:

Matthew Mannisto,
for Mother-Appellant.

Gregory H. Meyers,
(Meyers & Meyers LLC),
for Father-Appellant.

Russell K. Goo,
Julio C. Herrera,
Ian T. Tsuda,
Patrick A. Pascual,
Deputy Attorneys General,
Family Law Division, State of Hawaiʻi,
for Petitioner-Appellee-
 Cross-Appellee THE DEPARTMENT OF
 HUMAN SERVICES.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge

---

[10]/ In light of Mother and Father's prior arguments, we note that this ruling does not constitute the beginning of a new "two-year period" to address the issues that led to the removal of Children from the family home.