**Electronically Filed
Supreme Court
SCWC-22-0000636
13-FEB-2025
09:54 AM
Dkt. 61 AMOP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

IN THE INTEREST OF THE P CHILDREN

SCWC-22-0000636

CERTIOARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-22-0000636; FC-S NO. 19-1-0083 and FC-S NO. 19-1-0084)

FEBRUARY 13, 2025

RECKTENWALD, C.J., McKENNA, AND EDDINS, JJ., AND
CIRCUIT JUDGE NAKAMOTO IN PLACE OF GINOZA, J., RECUSED;
AND DEVENS, J., DISSENTING

AMENDED OPINION OF THE COURT BY EDDINS, J.

This case concerns when lack of counsel constitutes structural error, and thereby invalidates fundamentally fair Child Protective Act proceedings that serve a child's best interest.

We hold that there is no structural error when the family court does not provide counsel to an indigent parent who absents

themself from the case's initial proceedings and neglects the court's process for appointing counsel.

Because we find no structural error, and this years-long parental rights termination case was fundamentally fair, we affirm the family court's order that revoked foster custody, granted permanent custody of the children to DHS, and ordered the permanent plan of adoption by the children's adult half-sister.

## I.

In May 2017, Appellee-Mother (Mother) gave birth to a daughter, Taylor (to protect the minor's privacy, we use a pseudonym). Both Taylor and Mother tested positive for opiates and methamphetamines. The hospital notified the Department of Human Services about a threat of abuse and neglect. See Hawai'i Revised Statutes (HRS) § 350-1.1 (2015).

At the time, Father was incarcerated and Mother on felony probation. They never married.

In April 2019, Mother and Father had another daughter, Jordan (again, a pseudonym). Mother disclosed that she took suboxone (an opiate withdrawal medication) during her pregnancy. Medical personnel monitored Jordan for withdrawal symptoms. Like before, the hospital notified DHS of a threat of abuse and neglect.

On June 6, 2019, DHS filed a "Petition for Family Supervision" in the Family Court of the Second Circuit. HRS § 587A-12 (2018). DHS served Mother and Father with a summons to appear in family court on June 21, 2019. HRS § 587A-12(c)(2) ("The court shall conduct[] [a] return hearing[] . . . within fifteen days after the petition is filed"). The family court also appointed a Guardian Ad Litem (GAL) for the girls. HRS § 587A-16(a) (2018). Both the GAL and DHS social worker submitted reports throughout the case. Id.; HRS § 587A-18 (2018).

Neither parent showed up at the June 21, 2019 hearing. The family court granted DHS' oral motion for temporary foster custody. See HRS § 587A-26 (2018). "'Temporary foster custody' means a legal status created under this chapter with or without a court order, whereby the department temporarily assumes the duties and rights of a foster custodian of a child." HRS § 587A-4 (2018). The court set a return hearing for July 2, 2019. HRS § 587A-28 (2018) ("When a petition has been filed, the court shall conduct a return hearing within fifteen days of[] . . . [t]he date a decision is announced by the court during a temporary foster custody hearing.").

Mother appeared at the return hearing. The family court took no substantive action. It continued temporary foster custody. Per the court minutes, the court scheduled a "Return

3

Hearing w/ Counsel" in two weeks.  Because the record on appeal lacks transcripts for the case's initial proceedings, it is unclear whether the court directed Mother to return to court after completing the second circuit's one-page application for court-appointed counsel, or instructed her to return to court with retained counsel.

Mother missed the return hearing on July 16, 2019.  Based on the DHS social worker's testimony, the family court granted DHS foster custody.  HRS § 587A-15 (2018).  The court found that the children's "physical/psychological health/welfare has been harmed or is subject to threatened harm by the acts or omissions of mother and father, to-wit; threatened harm due to substance abuse that lead[s] to impaired parenting."  See HRS § 587A-7 (2018).

Mother disengaged from the case.  Father too.  Parental disengagement, the parties agree, is not an uncommon feature of chapter 587A proceedings.  Still, parents frequently re-engage.

About four months later, on November 5, 2019, Mother appeared in court.  Nothing substantive happened.  Like before, the court minutes reflect that the court scheduled a "Return Hearing w/ Counsel."  Again, it is unclear whether the court advised Mother to fill out an application for court-appointed counsel.  But we believe that the court was acquainted with the Family Court of the Second Circuit's standard indigency form and

understood HRS § 587A-17(a) (2018) ("The court may appoint an attorney to represent a legal parent who is indigent based on court-established guidelines."); HRS § 587A-25(d) (2018) ("If a party is without counsel or a guardian ad litem, the court shall inform the party of the right to be represented by counsel and the right to appeal."); and HRS § 571-8.5(a)(8) (2018) ("The district family judges may: . . . Appoint . . . attorneys to represent parties in accordance with law").

That same day, after court, Mother applied for counsel. One week later, on November 12, the court appointed her counsel.

Mother did not make the return hearing on November 26, 2019. But counsel appeared. The court continued all prior orders. Then, on December 3, 2019, Mother made it to court. Again, counsel appeared. With counsel's aid, Mother agreed to DHS' service plan. See HRS § 587A-27 (2018). Per the plan, she entered drug treatment.

Thereafter, Mother engaged in the case and appeared at all court hearings side-by-side with an attorney. Mother had a lawyer to the case's end – nearly three years later.

As Mother's case progressed, she appeared on the surface to do well, complying with the service plans. After a year of DHS foster custody, the court entered a family supervision order. See HRS § 587A-4 ("Family supervision" is "the legal status in which a child's legal custodian is willing and able, with the

assistance of a service plan, to provide the child with a safe family home."). The children reunited with Mother.

For almost one year, the children and Mother lived together. First in a drug treatment program for woman with children. Then with the girls' adult half-sister on O'ahu. And eventually with Father in a 20-foot trailer next to a home in Wailuku that Mother's father owned.

Family supervision proved unworkable. Because of abuse and neglect concerns, and Mother's drug use, in June 2021, DHS asked the court to revoke family supervision and reinstate DHS foster custody. See HRS §§ 587A-7 and 587A-15(a)(2) (2018). DHS reported that the two girls were developmentally maladjusted and physically aggressive. Both the DHS social worker and GAL described the girls as "feral." The DHS social worker informed the court that a good Samaritan had found four year-old Taylor running unattended on a street blocks from where they lived.

Mother also deceived DHS about her drug use and treatment efforts. DHS reported that Mother continued to use unlawful drugs, refused to drug test when asked, and despite saying she regularly attended drug treatment, no-showed for virtually every treatment session. DHS concluded "the children are not safe in [her] care."

After a status hearing on June 29, 2021, attended by Mother and her counsel, the family court revoked family supervision.

6

HRS § 587A-15(a)(2). DHS again took custody of the children. DHS then placed the girls on O'ahu with their paternal half-sister. HRS § 587A-15(b)(2). Since June 30, 2021, the children have lived there, under their sister's care.

Nearly three months after the children re-entered foster custody, the GAL reported that they were happy in their sister's home. They bonded well with her. Taylor, in particular, displayed noticeable improvement in her social interactions and behavior. The girls enjoyed pre-school and adjusted nicely to the structure their half-sister had established.

In October 2021, Mother agreed to her fifth service plan. The plan, like the others, required Mother to complete substance abuse treatment.

By March 2022, both the GAL and DHS social worker reported that the girls were "doing exceedingly well." The DHS social worker had previously reported that the girls kicked and hit her, but now she said, they were well-mannered. Their speech improved. They lived in a clean home. The girls greatly benefitted from a stable home life with an "extremely devoted" caretaker. They were "thriving."

In May 2022, DHS moved to terminate parental rights (TPR). HRS §§ 587A-4, 587A-32 (2018), and 587A-33 (2018). DHS had filed the petition for family supervision almost three years earlier, and the girls' time in foster custody totaled 21

months.  The DHS social worker submitted a permanent plan recommending adoption by the half-sister.  HRS § 587A-32(a)(1) ("The permanent plan shall[] . . . [s]tate whether the permanency goal for the child will be achieved through adoption, legal guardianship, or permanent custody.").

The court set a TPR trial date.  Shortly before trial, Mother's counsel moved to withdraw.  Counsel declared their relationship "irreparable."  The court granted the motion and appointed Mother new counsel.  On September 23, 2022, the family court held a trial.  Mother and Father both appeared with their own counsel.

DHS had the burden of proof.  HRS § 587A-33.  It presented evidence that the children's living conditions with Mother were unsafe.  DHS recounted, among other events, the incident where residents found Taylor running down the street blocks from the home.  A psychological evaluation revealed that Taylor felt lingering fear due to Mother leaving her alone in the trailer. Testimony also centered on the girls' behavioral issues under Mother's care – they were described as "out of control" –  and how it reflected neglectful parenting.  DHS introduced evidence about Mother's drug use, deception, failed treatment efforts, and her inability to follow the service plans.  And DHS presented substantial evidence regarding the girls' positive transformation while in their sister's care.

8

The family court terminated Mother's and Father's parental rights.  It found that Mother and Father were not willing and able to provide the children with a safe family home, even with the assistance of a service plan.  HRS § 587A-33(a)(1)-(2).  The court ruled that DHS' permanent plan with the goal of adoption by the girls' half-sister served the best interest of the children.  HRS § 587A-33(a)(3).

One month after the family court's order terminating parental rights, Mother's trial counsel moved to withdraw, saying Mother was unsatisfied with his representation.  That same day, Mother's new lawyer filed a notice of appeal in the ICA.  Later, the court granted her trial lawyer's motion to withdraw.  (The procedural and jurisdictional issues surrounding the switch in lawyers have no consequence here.)

Mother appealed.  Father did not.  Mother raised two issues.  First, she argued (for the first time) that the family court erred by appointing the GAL because the GAL had previously represented Mother in a different matter.  Second, she argued that the family court committed structural error by failing to appoint her new counsel after granting her trial counsel's post-trial motion to withdraw.  Mother said she could not preserve the guardian ad litem issue because "she was stuck with an attorney" who disagreed with her, "and she was not appointed another attorney after he was discharged."

9

DHS responded that Mother's first point of error lacked merit because she did not raise it in the family court. DHS also maintained that no structural error occurred. The family court did not appoint Mother new counsel because she had already hired someone. Mother was never without counsel after the trial.

The ICA ordered supplemental briefing. It wanted the parties to examine "whether appointment of counsel for Mother was timely."

In a memorandum opinion, the ICA held that the failure to immediately appoint counsel constituted structural error: "the Family Court's failure to appoint Mother counsel for 144 days, between June 21, 2019 (when temporary foster custody was requested and granted) to November 12, 2019 (when counsel was appointed) was structural error which requires vacatur of orders affecting custody of the Children from June 21, 2019." The ICA did not address Mother's argument about the GAL's putative conflict.

The ICA's opinion invalidated all custody orders affecting the best interest of the children. The CPA proceedings had to start over.

The GAL applied for cert. The Department of Human Services joined the application. We accepted cert.

## II.

In Hawai'i, "parents have a substantive liberty interest in the care, custody, and control of their children." In re Doe, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002). To support that fundamental right, the Hawai'i Constitution's due process clause, article I, section 5, confers parents a right to counsel in Child Protective Act proceedings. In re T.M., 131 Hawai'i 419, 421, 319 P.3d 338, 340 (2014). "[C]ourts must appoint counsel for indigent parents once DHS files a petition to assert foster custody over a child." Id.

What if the court does not? In re L.I. introduced structural error – an error that upsets the integrity of the judicial process - to CPA proceedings. 149 Hawai'i 118, 122, 482 P.3d 1079, 1083 (2021). Because of the constitutionally protected liberty interest at stake, once parental rights are substantially affected, the family court should provide counsel to an indigent parent. Id. Otherwise, structural error results. And thus, despite a fundamentally fair, error-free process that serves a child's best interest, the case starts over. (L.I was published after DHS filed a petition for family supervision in the present case.)

T.M. and L.I. involved cases where a structural error solution was evident.

In T.M., all the parties except T.M.'s 15 year-old mother had counsel throughout the case. 131 Hawai'i at 422, 319 P.3d at 341. The young mother actively engaged with the case from the very start. Yet 19 months passed between her child's placement in foster custody and the court's appointment of counsel to protect her interests. Id. at 433, 319 P.3d at 352. She later lost her right to parent. Id. at 429, 319 P.3d at 348.

This court disapproved. We didn't adopt structural error then. But we ruled that no matter what, the mother did not receive a constitutionally sound process. She lacked a lawyer "to inform her of the limitations of the guardianship approach and of the possibility that if other options were pursued, her parental rights would be in jeopardy"; "advise her of significant deadlines" (like the two-year cutoff to provide a safe family home); or provide "necessary assistance to prepare for the . . . termination hearing." Id. at 432-33, 319 P.3d at 351-52. Had mother received counsel sooner, this court said, there's a chance she would've followed the family service plan's terms and provided T.M. with a safe family home at an earlier date. Id. at 433, 319 P.3d at 352.

L.I. also had clear-cut structural flaws. There, the family court appointed the mother counsel three months after the court awarded DHS foster care, and 10 months after DHS' initial petition for family supervision. 149 Hawai'i at 119-20, 482 P.3d

12

at 1080-81. During that time, the mother had engaged with the case. She participated in court hearings, consented to family supervision, and agreed to two service plans. Id. Yet she had no lawyer to help navigate family court and chapter 587A's demands.

L.I. directed family courts to appoint counsel for indigent parents when DHS files a petition for family supervision because, at that point, parental rights are substantially affected. Id. The failure to do so, this court ruled, amounts to structural error, requiring automatic vacatur of best interest findings without having to show harmful error. Id. at 123, 482 P.3d at 1084.

The T.M. and L.I. mothers approached their chapter 587A cases in the same way. They were involved from the first hearing. The mothers actively engaged in the case before receiving counsel. T.M.'s mother participated in an 'ohana conference, and she agreed to two HRS § 587A-27 family service plans. T.M., 131 Hawai'i at 423-24, 426, 319 P.3d at 342-43, 345. As for L.I.'s mother, she consented to family supervision and also agreed to two service plans over a ten month period. L.I., 149 Hawai'i at 119-20, 482 P.3d at 1080-81. Both mothers attended every court hearing. Despite their engagement, the family court did not offer them court-appointed counsel. As the government worked to strip the mothers' parental rights, they

13

fended for themselves.  We remanded both cases for new proceedings.

Last year, In re JH tacked from a "no questions asked" structural error approach in CPA right to counsel cases.  152 Hawai'i 373, 526 P.3d 350 (2023).  "[W]hen, how long, and the reason" a parent goes without counsel matter when it comes to assessing whether structural error nullifies best interest determinations.  Id. at 379, 526 P.3d at 356.

In JH, the parents appeared at the first hearing and were appointed counsel.  Id. at 377, 526 P.3d at 354.  But the parents didn't show for the next hearing.  Id.  So the court discharged counsel.  Id.  Five months later, the parents reappeared.  Then counsel represented them to the end, including a TPR trial.  Id.  JH held that counsel's absence during CPA proceedings does not always vacate best interest findings.  Id. at 376, 526 P.3d at 353.  There are limits to the right to counsel in parental termination cases.  JH clarified that an indigent parent's constitutional right to counsel "is not automatically violated when a beneficiary of that right voluntarily absents themself from family court proceedings." Id. at 379, 526 P.3d at 356.

JH pointed out that neither T.M. nor L.I. required reversal for structural error when an indigent parent is not from start

to finish represented by court-appointed counsel in CPA proceedings.  Id. at 378, 526 P.3d at 355.

Automatic reversal of best interest findings due to a parent's voluntary absence undercuts the paramount principle controlling chapter 587A proceedings – a fair resolution that serves the best interest of the child.  For sure, the family court must protect a parent's constitutional right to parent their child.  And the family court must honor a parent's constitutional right to counsel.  But if an appellate court robotically vacates best interest findings, "then the time it takes to permanently place a child drags on."  Id. at 379, 526 P.3d at 356.  JH talked about structural error's downside.  The child may suffer.  And it's the child's best interest that steers a chapter 587A case.  We repeated that it is "in the child's best interest and overall well being to limit the potential for years of litigation and instability."  Id. (citing In re RGB, 123 Hawai'i 1, 26, 229 P.3d 1066, 1091 (2010)).

JH held that a gap in legal representation due to a parent's voluntary absence did not – considering everything – warrant unravelling the proceedings and vacating an order terminating parental rights.  See 152 Hawai'i at 379, 526 P.3d at 356.  We declined to apply structural error to cases involving discharged counsel because structural error is inflexible and ignores the practicalities of the situation.  Id.

Thus, JH established that there is no structural error after a family court discharges counsel, and then later re-appoints counsel in CPA proceedings. Id. at 380, 526 P.3d at 357. So long as the parent receives a fundamentally fair procedure, a best interest determination that results in a termination of parental rights will go undisturbed. Id.

Due process was satisfied in JH. Id. at 381, 526 P.3d at 358. No hearings happened between the five-month gap between when the parents voluntary absented themselves and then re-engaged in the proceedings. Id. When the parents reappeared and re-engaged, so did counsel. Id. After that, counsel represented the parents until the end of the TPR trial. In all, the parents were represented for 22 of 27 months. Id. Since there was no structural error, we examined the trial. Substantial evidence supported the family court's HRS § 587A-33(a) termination of parental rights findings. Id.

In the present case, the family court did not appoint counsel for Mother at the initial proceedings. But it was Mother's failure to show up in court and follow the court's process that foiled legal representation. Once Mother appeared, completed an application for court-appointed counsel, and engaged, she received legal representation. Thereafter, counsel represented Mother for 34 uninterrupted months. Further, the record shows that after Mother received counsel, she had

16

opportunities to reunite with her children before the family court terminated her parental rights.

The delay in receiving counsel did not harm Mother's case. Had the court provided the absent Mother a lawyer during the initial hearing, what would that attorney have done?  See JH, 152 Hawaiʻi at 380, 526 P.3d at 357 ("If a parent chooses not to appear in court or decides not to communicate with counsel, then counsel is hard-pressed to understand the parent's present objectives, and is challenged to provide sound, ethical representation.").  The dissent says that counsel may "immediately contact and appropriately advise the parent."  If contact and the attorney-client relationship are established, then counsel would likely communicate the value of participation.  But at this stage, we do not believe that lack of counsel upsets a "trial's entire framework, its structure." JH, 152 Hawaiʻi at 379, 526 P.3d at 356.

An unbending structural error approach unfairly benefits a voluntarily absent parent at the expense of their child.  "A parent's choice not to appear in court or maintain contact with counsel should not undermine a child's interests in permanency." Id.  Because the best interest of the child are foremost, a family court cannot simply freeze the case to await the emergence of a disinterested parent and that parent's compliance

17

with the court's process for appointing counsel.  See HRS § 587A-2 (2018).

The dissent's position may create situations where the best interests of the child are waylaid by structural error's rigidity.  Consider a parent who did not appear in court until the last day of a TPR trial.  If the court did not appoint counsel for that parent at the case's initiation, then structural error applies, and there is no harmlessness review.  Therefore, each best interest finding gets vacated, and the court must re-start the proceedings, thereby upending the child's interest in permanency.

We hold that a parent's constitutional right to counsel is not invoked for structural error purposes until they appear and engage in the case, which includes complying with the court's process for determining indigency.

## A.   Mother Received a Fundamentally Fair Proceeding

When the government uses its power to untie the parent-child relationship, article I, section 5 of our state constitution demands a fundamentally fair process.

But here, the ICA gave "no attention to whether the proceedings [after Mother received counsel] were fundamentally fair."  JH, 152 Hawai'i at 379, 526 P.3d at 356.  The ICA applied structural error, thereby invalidating the family court's

18

findings and conclusions advancing the best interest of the children.

Mother's decision to disengage did not trigger structural error. She absented herself for almost the first five months of the case. Once on track, however, Mother had legal representation at every hearing, including the TPR trial. Mother had a "meaningful opportunity to participate in [her] case with the aid of counsel." Id. at 381, 526 P.3d at 358. After Mother received counsel, DHS and the family court gave her time to get on her feet. She attended drug treatment and parenting classes. The family court granted her family supervision. She had the opportunity to reunite with the children, something she didn't have when she neglected the first several months of the case.

The service plans, the court later found, gave Mother the best chance at "remedying the problems which put the Children at substantial risk of being harmed in the family home." Within two weeks of being appointed counsel, Mother committed to her first service plan. Throughout the case, Mother agreed with and committed to five service plans, all with the aid of counsel.

After six months of participating in a drug treatment program, Mother showed she was willing and able to provide the children with a safe family home. See HRS § 587A-4. The family court credited her efforts by granting family supervision. Then

19

with counsel's help, Mother seemingly complied with the terms of the various plans and provided the children with a safe family home.  Compare T.M., 131 Hawaiʻi at 433, 319 P.3d at 352 ("It may be that had counsel been appointed sooner, Petitioner may have been able to comply with the terms of the family plan and provided T.M. with a safe family home at an earlier date.").  But even with counsel's assistance and the service plans, Mother struggled.  The family court revoked family supervision after nearly a year.

The court found that "Mother and the Father were given every reasonable opportunity to complete their services and effectuate positive changes to enable them to provide a safe family home with the assistance of a service plan in order to be reunified with the Children."  Mother tried.  But unfortunately, she could not comply.

Some parents in Chapter 587A proceedings suffer from substance use disorders.  Substance use disorders are "patterns of substance use that cause damage to physical or mental health or lead to clinically significant functional impairment or distress."  Nora D. Volkow & Carlos Blanco, Substance Use Disorders: A Comprehensive Update of Classification, Epidemiology, Neurobiology, Clinical Aspects, Treatment and Prevention, 22 World Psychiatry 203, 204 (2023) (footnote omitted)

https://onlinelibrary.wiley.com/doi/epdf/10.1002/wps.21073 [https://perma.cc/7JN6-Z3ZT].  In Hawai'i, it is estimated that each year "500-650 children (about half of confirmed cases of child abuse or neglect) are at high risk of entering foster care because of their parent's substance use disorder."  Yoko Toyama Calistro & Karen Worthington, Strategies to Help CWS-Involved Parents Complete Substance Use Treatment and Protect their Children in Hawai'i, 81 Haw. J. Health & Soc. Welfare, 37, 37 (2022) https://pmc.ncbi.nlm.nih.gov/articles/PMC9783818/pdf/hjhsw8112_S 3_0037.pdf [https://perma.cc/76E8-D3FK].  From 2016 to 2020, parental alcohol and drug use contributed to about half of the child abuse and neglect cases.  Id.

Mothers and fathers struggling with substance use may still satisfactorily parent their children.  They may, in fact, be really good parents.  "Parental substance use or SUD does not by itself constitute [child abuse and neglect]."  Id.  Rather, "[child abuse and neglect] occurs when . . . children's needs are not met because of the parent's use of substances."  Id.

We are mindful that HRS § 587A-7(a)(7) includes "history of substance abuse by the child's family" as a factor to consider "when determining whether a child's family is willing and able to provide the child with a safe family home."  But we stress that a parent's substance use, unaccompanied by evidence

21

relating to HRS § 587A-7(a)(1) or other HRS § 587A-7 safe family home factors, does not support the loss of parental rights.

Mother does not argue on appeal that her case was fundamentally unfair. Or that there was not substantial evidence to support terminating her parental rights. The family court cited the witnesses' testimony and the exhibits (reports from GAL and the DHS social worker) for support. The court found that Mother was willing, but ultimately unable to provide the children with a safe family home now or in the future, even with a service plan. See HRS § 587A-33(a)(1), (2). The court concluded that the children were thriving in their sister's care. And there was "clear and convincing evidence that it [was] in their best interest to remain where they are and be adopted and for the parental rights to be terminated." See HRS § 587A-33(a)(1), (2). Mother does not challenge the family court's best interest findings.

## B.  Appointing Counsel in CPA Proceedings

The family court's decision to forego an early indigency determination troubles us. At the start, Mother appeared in court for two hearings. She didn't make back-to-back appearances, but when she showed, the court had an easy opportunity to make an indigency finding and appoint counsel.

During oral argument, the parties disagreed on most things. They agreed though that CPA cases overwhelmingly involve indigent parents.

To fortify the right to counsel and (ideally) decrease representation-related appeals that may undo best interest findings, we direct family courts to make an indigency determination at a parent's first appearance in a chapter 587A proceeding that substantially affects parental rights. HRS § 602-4 (2016).

Courts may make this indigency finding after an on-the-record colloquy covering financial status. Or courts may on-the-spot have a parent complete a standard application for counsel form. (Like the simple form Mother eventually filled out, or the "application for court-appointed counsel" form used by the third circuit in T.M., 131 Hawai'i at 422, 319 P.3d at 341.) Also, DHS typically has information related to a parent's financial plight, the parties pointed out, so DHS may be able to aid the court's indigency determination. If there's uncertainty regarding indigency or resistance from a parent, the right to counsel demands that the family court appoint counsel.

After the court makes an indigency determination at the first hearing attended by a parent, the family court should expeditiously undertake efforts to appoint counsel. (That is, if the court hasn't already secured counsel before that

23

hearing.)  We recognize that the availability of counsel and the immediate demands of chapter 587A may pose challenges.  But determining indigency when the parent first appears will activate the right to counsel, curb structural error appeals, and advance the child's interest in permanency.

## C.  **Mother Waived Any Conflict with the GAL**

We turn to the two points of error Mother raised in her opening brief to the ICA.  The case has spanned more than five years.  Judicial efficiency and a permanent resolution that serves the best interest of the children favor resolving the merits here instead of remanding the case to the ICA.

First, Mother argued that the family court erred by appointing the GAL because the GAL had a conflict – she previously represented Mother in a different matter.

Mother did not raise her concern in family court.  She leveled her conflict accusation for the first time on appeal. She concedes there is nothing in the record regarding a possible conflict.  In the GAL's answering brief to the ICA, the GAL declared that she discussed the issue with Mother and her counsel at the time.  Mother waived any potential conflict, the GAL represented.  Mother's briefing does not dispute this.  We conclude that Mother waived the issue and failed to preserve it for appeal.  See Hawai'i Rules of Appellate Procedure Rule 28(b)(4)(iii).

Mother's second argument – the family court erred by failing to appoint her new counsel after granting her trial counsel's post-trial motion to withdraw – also lacks merit. Mother says that "[h]ypothetically," she could have litigated her first point of error (the GAL's putative conflict) in a motion for reconsideration or new trial. Thus, the family court's failure to appoint her substitute counsel was structural error.

Mother misconstrues structural error. She was never without counsel after the trial. On the same day that Mother's trial counsel moved to withdraw, Mother's new counsel filed a notice of appeal in the ICA. Mother's trial counsel continued as her court-appointed counsel pending the hearing on the motion to withdraw. Once the court discharged the trial counsel, it did not need to appoint Mother new counsel because she had already hired someone. There is no structural error.

## III.

We vacate the ICA's September 26, 2023 judgment on appeal that vacated orders affecting custody of the children from June 21, 2019. We affirm the Family Court of the Second Circuit's September 26, 2022 order revoking foster custody, granting

25

permanent custody of the children to DHS, and ordering the

permanent plan of adoption by the children's adult half-sister.

Eitan Arom                              /s/ Mark E. Recktenwald
for petitioner Nicole Forelli,
Guardian Ad Litem                       /s/ Sabrina S. McKenna

Terence Y. Herndon                      /s/ Todd W. Eddins
(Julio C. Herrera, Patrick A.
Pascual, Abigail S. Dunn Apana          /s/ Henry T. Nakamoto
on the briefs)
for respondent Department of
Human Services

Matthew Mannisto
for respondent Mother

Davelynn M. Tengan
(on the briefs)
for respondent Father

